1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

NICOLE and GUY MAEL, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

EVANGER'S DOG AND CAT FOOD CO., INC., and NUTRIPACK, LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**COMPLAINT – CLASS ACTION**

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs Nicole and Guy Mael ("Plaintiffs"), by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated, and the general public, based upon personal knowledge as to themselves and their activities, and on information and belief as to all other matters, against Defendants, Evanger's Dog and Cat Food Co. and Nutripack, LLC ("Nutripack") (collectively referred to as "Evanger's" or "Defendantss"). Evanger's produces high-end pet foods that are specifically marketed to label-conscious consumers but that, contrary to their labels, contain harmful ingredients that caused several of Plaintiffs' pets to become sick and caused one to die.

## JURISDICTION AND VENUE

1.      Diversity subject matter jurisdiction exists over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from Defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

2.      This District Court also has jurisdiction under 28 U.S. Code § 1331 because the action arises out of a federal law of the United States, 15 U.S.C. § 2301, *et seq*.

3.      While the exact number of members in each of the proposed classes is unknown at this time, Plaintiffs have reason to believe that thousands of consumers purchased Defendants' pet food throughout the United States, including in Washington, during the relevant period.  The number of class members could be discerned from the records maintained by Defendants.

4.     While the exact damages to Plaintiffs and the members of the classes are unknown at this time, Plaintiffs reasonably believe that their claims exceed five million dollars ($5,000,000) in the aggregate.

5.     Jurisdiction   is also proper pursuant to 28 U.S.C. § 1367, which provides, in relevant part, that: (a) "in any action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution . . . includ[ing] claims that involve the joinder . . . of additional parties."

6.     This Court has personal jurisdiction over Defendants because it has purposefully availed itself of the privilege of conducting business in the State of Washington by selling its products to persons in Washington online and through retailers, and a substantial number of the events giving rise to the claims alleged herein took place in this District.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District and because Defendants:

    a.     has intentionally availed itself of the laws and markets within this District through the promotion, marketing, distribution and sale of their products in this District;

    b.     does substantial business in this District, including selling its products in this District; and

    c.     is subject to personal jurisdiction in this District.

8.     Venue is proper in this Court as to the Plaintiffs and claims under the doctrine of pendant venue.

- 3 -

## **NATURE OF THE ACTION**

9.    Plaintiffs bring this class action to obtain damages and equitable relief for themselves and all others similarly situated, both in Washington and nationwide, who purchased Defendants' Pet Foods[1], which were advertised as premium, "100% beef," and "human grade, USDA inspected meat," but instead were composed of low quality, non-human grade ingredients and were produced at an unsanitary, non-USDA facility. Many of the Pet Foods were unsafe, adulterated meats, not from animals that were identified on the labels, and contained ***pentobarbital, a barbiturate used in the euthanizing of animals, the execution of humans and in physician-assisted deaths*** Plaintiffs' use of these products led to the sickness of several of Plaintiffs' pets, and the death of one.

10.    Defendant Evanger's produces dog and cat food products in the United States that it sells online, and through a network of distributors to retailers. Evanger's Pet Foods are aimed specifically at customers, like Plaintiffs, who want premium, safe and healthy meals for their pets, and are willing to pay a hefty price for them compared to other brands.

11.    Evanger's touts its "premium," "human grade," "USDA inspected meats" that are "100% natural, raw meats" and do not contain "soy, corn, wheat, artificial ingredients, preservatives, harmful additives or by-products" to customers. It claims to be a "5-star" rated Pet Food.

12.    Evanger's has one of the few canneries in the country for pet foods, and produces and packages both its own brand-named products as well as its Against the Grain brand products.  Evanger's also produces and packages pet foods for other companies' brands, including Party Animal Pet Foods ("Party Animal").

---

[1] As used herein, the term "Pet Foods" refers collectively to Evanger's brand-named products and its Against the Grain brand pet foods.

13.   Evanger's Against the Grain brand, produced at its manufacturing facility, also targets customers, like Plaintiffs, who seek to purchase products with high quality ingredients for their pets and are willing to pay a premium price compared to other brands. Against the Grain states that it uses "safe," "human grade," "highest quality," "fresh" ingredients. It also boasts that its products are gluten-free and grain-free "sourced from human grade facilities" and composed of 100% specific meat.

14.   On December 31, 2016, relying on Defendants' representations about the Pet Foods, Plaintiffs purchased Evanger's Hunk of Beef Au Jus ("Hunk of Beef") and Against the Grain's Grain Free Pulled Beef with Gravy canned dog food ("Pulled Beef") for their five dogs. Immediately, after consuming the Hunk of Beef all of the dogs became ill - acting listless and non-responsive. Plaintiffs rushed them to an emergency veterinarian. The next day, one of Plaintiffs' dogs, Talula, died after being poisoned by the Hunk of Beef. As a result of consuming the Pet Foods, Plaintiffs' four other dogs have had to undergo ongoing veterinarian treatments and monitoring, including Tito, who is now being treated for seizures.

15.   After Talula's death, the Federal Food and Drug Administration (the "FDA"), began working with Plaintiffs and the retailer who had sold the Pet Foods to Plaintiffs, and arranged for a necropsy and toxicology testing to be performed on Talula's body and the Pet Foods. The FDA conducted the testing and found a large amount of pentobarbital in the animal's stomach and in the undigested Pet Food. The FDA then directed testing of the remaining Hunk of Beef product and the unopened Hunk of Beef and Pulled Beef products purchased by Plaintiffs. The testing further confirmed the contamination of pentobarbital in the Pet Foods.

16.   The FDA determined that Evanger's meat supplier, with which it had a forty year relationship, had in fact provided a label on its meat informing Evanger's that the meat was "***Inedible*** Hand Deboned Beef" "For Pet Food Use Only. ***Not Fit***

*for Human Consumption*." The FDA also found that *none* of Evanger's beef suppliers are inspected by the United States Department of Agriculture Food Safety and Inspection Services ("USDA-FSIS"), and that *none* of its meat was human grade. The FDA also noted unsanitary conditions at Evanger's manufacturing facilities at both its Wheeling, Illinois and Markham, Illinois locations that further contaminated its Pet Foods. The FDA and Evanger's own testing also found trace amounts of pork and horse in its products that were labeled as "100% beef."

17.  Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), the FDA is primarily responsible for making sure that food for both people and animals is safe, properly manufactured, and properly labeled. The FDCA, 21 U.S.C. § 342(a)(1), prohibits foods that are adulterated due to poisonous substances; preparation, packaging or holding under insanitary conditions causing contamination; or products of a diseased animal or of an animal, which has died otherwise than by slaughter. The FDA determined that Defendants' Pet Foods were adulterated.

18.  Defendants has misrepresented the quality of its Pet Foods' ingredients and manufacturing. It falsely stated that the Pet Foods are safe and sourced from human-grade, USDA inspected meats when in fact they are not. These misrepresentations and omissions relating to the quality of the meat and health risks ultimately led to a recall of certain products beginning on February 3, 2017 (for certain Hunk of Beef lots); on February 13, 2017 (for certain Pulled Beef lots); and on March 3, 2017 for all lots of Evanger's Hunk of Beef, Pulled Beef and Braised Beef products.

19.  Despite insisting that no other products were impacted by the recalls, on April 13, 2017, three and a half months after Talula died, another dog became ill after eating Party Animal pet food - manufactured by Evanger's. The Party Animal products also tested positive for pentobarbital, and on April 17, 2017, Party Animal

1  publicly recalled its Cocolicious Beef & Turkey dog food and Cocolicious Chicken
2  & Beef dog food.

3   20. Following the recall of Party Animal's products, Party Animal sued
4  Defendants for damages based on the misrepresented meat that Evanger's sold to it.
5  Party Animal seeks damages relating, but not limited to, retailers that are seeking
6  refunds for its recalled and non-recalled products and consumers, who are seeking
7  payment of veterinarian bills for treatment of their pets caused by their consumption
8  of its products. The lawsuit also alleges that in February 2017, Party Animal began
9  receiving invoices from Nutripack instead of Evanger's. When it inquired about this,
10 an owner of Evanger's, Holly Sher, stated that they were afraid of getting sued
11 because of the recent recalls, and they were taking money out of Evanger's. She also
12 stated that they did not want to receive any money into Evanger's and would instead
13 run all operations under Nutripack.

14  21. Plaintiffs and the other members of the proposed classes have purchased
15 Defendants' Pet Foods, and relied on Defendants' misrepresentations about their
16 products' high quality, human-grade ingredients and sources of USDA inspected
17 meat. Defendants also omitted material facts about the quality of the meat in the Pet
18 Foods and the health risks they carried, including but not limited to the fact that they
19 may be contain poisonous pentobarbital, were contaminated from the unsanitary
20 manufacturing facilities and were from animals that did not die from slaughter.

21  22. The Pet Foods were unsafe for animals to consume and should not have
22 been sold under the law. Had Defendants disclosed the true facts concerning these
23 products, Plaintiffs would have been aware of them, the potential harm and would
24 not have purchased Defendants' Pet Foods or not paid as much money for them.
25 Defendants' false and misleading labels touting the purity and quality of their
26 products allowed Defendants to charge a higher price than it could have without
27 these representations.

28

23.  In fact, the prices Defendants charges for its Pet Foods are among the highest in the industry.  The price of Evanger's Hunk of Beef on its website, which retailers sell for even more, is $36.91 for a case of twelve 12 ounce cans, or $3.07 per can, and the price of its Against the Grain's Pulled Beef is $37.22 for twelve 13 ounce cans, or $3.10 a can. If Defendants were to now disclose the truth about the ingredients, manufacturing and source of their products, Plaintiffs and the classes would be in a position to make an informed decision as to whether to purchase Defendants' Pet Foods at the price of those products.

24.  Plaintiffs bring this class action against Defendants, on behalf of themselves, the proposed classes, and the general public, in order to: (a) halt the dissemination of Defendants' deceptive advertising and marketing; (b) correct the false and misleading perception Defendants has created in the minds of consumers through their misrepresentations; and (c) secure redress for consumers who have purchased one or more of Defendants' Pet Foods, including not only the cost of the Pet Foods, but also any veterinarian costs related to the consumption of the Pet Foods.

25.  Plaintiffs, on behalf of themselves and the proposed classes, bring claims against Defendants for violation of the federal Magnuson-Moss Warranty Act; breach of express warranties and implied warranties of merchantability; violation of the Washington Consumer Protection Act and Illinois Consumer Fraud and Deceptive Business Practices Act; negligence; product liability; and unjust enrichment.

## PARTIES

*Plaintiffs*

26.  Plaintiffs Nicole and Guy Mael are husband and wife, who reside in Washougal, Washington and are citizens of Washington. They had five dogs, Talula,

- 8 -

Tank, Pedro, Tinkerbell and Tito, until January 1, 2017, when Talula passed away after eating Evanger's Hunk of Beef that was contaminated with pentobarbital.

27.  Members of the putative classes reside in Washington and throughout other states in the United States.

28.  During the relevant period, Plaintiffs, while in the state of Washington, were exposed to and saw Defendants' material, deceptive marketing claims and packaging that misrepresented the quality and ingredients of their Pet Foods and omissions that failed to disclose material facts about the meat used and the health risks it carried to animals that consumed it. Before purchasing Defendants' Pet Foods, Plaintiffs reviewed the product labels and Defendants' websites and relied on these in making their decision to purchase the Pet Foods. Plaintiffs, relying on Defendants' omissions and misleading marketing and labeling of their Pet Foods, believed that Defendants' Pet Foods were premium, "human grade," "USDA inspected meats" and did not carry any health risks to their pets. While in the state of Washington, Plaintiffs purchased Defendants' Pet Foods intermittently at a local retailer, Healthier Choices, in Washougal, Washington, over a four year period, including on December 31, 2016, when they purchased five cans of Evanger's Grain Free Rabbit for dogs and cats at $1.65 per can, three cans of Hunk of Beef at $3.20 per can and three cans of Pulled Beef at $3.60 per can.  Exhibit A receipt from purchase.

29.  Had Defendants disclosed the truth about their Pet Foods - that the products were *not* premium, human grade nor sourced from USDA inspected meats, and their health risks to animals that ate them, as was known to or should have been known to Defendants – then Plaintiffs would have been aware of the true nature of these products, and would not have paid the price that they paid for the Pet Foods, or would not have purchased them at all. In the future, if Defendants were to disclose that its Pet Foods are not high quality, not human grade and not from USDA

inspected meats, Plaintiffs would be in a position to make an informed decision as to whether to purchase Defendants' products at the prices offered. Thus, as a result of Defendants' material unfair and deceptive misrepresentations and omissions, Plaintiffs suffered injury in fact and lost money, and most importantly, lost their beloved companion animal.

***Defendants***

30.  Evanger's is incorporated in Illinois, and has its corporate headquarters at 211 Wheeling Road, Wheeling, Illinois 60090. It was started in 1935 by Fred Evanger. It is currently owned by Joel, Holly, Chelsea and Brett Sher, who acquired it in 2002, when they developed the "human-grade" ingredients, and hand-packed products line, including Hunk of Beef, Braised Beef and Pulled Beef. It has two facilities, one in Wheeling, Illinois, and one it opened in 2014 in Markham, Illinois.[2]

31.  Nutripack located in Markham, Illinois, is an Illinois limited liability company, owned and operated by the Sher family. Nutripack manufacturers Evanger's Pet Foods. According to the lawsuit filed by Party Animal, Evanger's began invoicing Party Animal through Nutripack in February 2017, following the recall of the Pet Foods. Holly Sher, an owner of Evanger's and Nutripack, indicated that it was defunding Evanger's and running its funds through Nutripack to avoid liability relating to the recalls.

32.  Evanger's produces many different lines of pet food under its own name and under the brand name Against the Grain.  Evanger's sells its products online and through retailers across the country. Evanger's also produces other companies' brands, including but not limited to Party Animal. Evanger's publicly stated on its website on January 4, 2017, that "Hunk of Beef is our #1 seller. Pets consume over

---

[2] Evanger's Fact, Our Story, http://www.evangersfacts.com/evangers-history/ (last visited May 15, 2017).

one million cans of Hunk of Beef per year."[3] Evanger's, Voluntary Recall, January 4, 2017, http://evangersdogfood.com/news-events/pug-family-updates/ (last visited February 17, 2017) (since removed).

33.   Plaintiffs allege, on information and belief, that at all times relevant herein, Defendants' agents, employees, representatives, executives, directors, partners, and/or subsidiaries were acting within the course and scope of such agency, employment, and representation, on behalf of Defendants.

## FACTUAL ALLEGATIONS

## I.   BACKGROUND ON REGULATION AND LAWS GOVERNING THE PET FOOD INDUSTRY

34.   The FDA and USDA are tasked with regulating pet foods, labels and manufacturing to keep humans and animals safe.  The FDA regulates animal protein ingredient suppliers, which may also be subject to state jurisdiction. The USDA-FSIS regulates the slaughter of animals for human consumption and provides grading and definition of various products including testing for speciation. The USDA- Animal and Plant Health Inspection Service ("APHIS") provides a voluntary service to inspect and provide certification status to facilities according to standards established by the country where the facilities wish to export their products. APHIS does not have direct regulatory responsibility over pet food. [4]

35.   The Association of American Feed Control Officials ("AAFCO") is a voluntary membership association of local, state and federal agencies charged by

---

[3] Evanger's, Voluntary Recall, January 4, 2017, http://evangersdogfood.com/news-events/pug-family-updates/ (last visited February 17, 2017) (since removed).

[4] FDA, Questions and Answers: Evanger's Dog and Cat Food ("FDA Q&A"), https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm544348.htm (last visited April 27, 2017).

law to regulate the sale and distribution of animal feeds and animal drug remedies. AAFCO has no regulatory authority, but provides a forum for the membership and industry representation to create model guidelines for pet food to safeguard the health of animals and humans; ensure consumer protection; and provide a level playing field of orderly commerce for the animal feed industry.[5]

36.   Under the FDCA, 21 U.S.C. § 342(a)(1), a "food," which includes human and pet food, is considered adulterated if it contains a poisonous or deleterious substance; is contaminated by insanitary conditions; or is sourced from an animal that did not die by slaughter. Food may also be deemed adulterated if under § 342(b) it is substituted. This law is in place to protect people and their pets from the risk from consuming poisonous, contaminated, euthanized, diseased or decomposing animal tissues. Specifically, the law states, in pertinent part:

A food shall be deemed to be adulterated-

(a) Poisonous, insanitary, etc., ingredients

(1) If it bears or contains **any poisonous or deleterious substance** which may render it injurious to health . . . (2)(A) if it bears or contains any added poisonous or added deleterious substance . . . that is unsafe within the meaning of section 346 of this title . . . (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been **prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth**, or whereby it may have been rendered injurious to health; or (5) if it is, in whole or in part, the product of a diseased animal or of an **animal which has died otherwise than by**

_____

[5] AAFCO, Home and Regulatory, http://www.aafco.org/ (last visited April 27, 2017).

*slaughter* . . .

(b) Absence, substitution, or addition of constituents

(1) If any valuable constituent has been in whole or in part omitted or abstracted therefrom; or (2) if any substance has been substituted wholly or in part therefor; or (3) if damage or inferiority has been concealed in any manner; or (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.

(Emphasis added).

37.   Under the FDCA, 21 U.S.C. § 343(b), a food is deemed misbranded if it is offered for sale under the name of another food.

38.   Despite laws governing pet foods and providing government oversight, the FDA has stated that "[p]et food manufacturers are responsible for taking appropriate steps to ensure that the food they produce is safe for consumption and properly labeled" including verifying the identity and safety of the ingredients from suppliers.[6] Because pet food companies are left to self-regulation, many often do not follow laws and rarely face any repercussions until it is too late for some pets, who have died or become sick as a result.

39.   Many states have enacted their own regulations governing pet foods that prohibit adulteration and misbranding including in Washington, Illinois and Wisconsin.[7] *See* Wash. Rev. Code § 15.53.902 (adulteration) and §15.53.9022

_____

[6] FDA Q&A, https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafety Information/ucm544348.htm.

[7] *See* Wash. Rev. Code § 15.53.902 (adulteration) and §15.53.9022 (misbranding); 505 Ill. Comp. Stat. 30/3(s) (pet food), 30/7 (adulteration) and 30/8 (misbranding); WI Stat. § 94.72 (8) (adulteration and misbranding).

- 13 -

(misbranding); 505 Ill. Comp. Stat. 30/3(s) (pet food), 30/7 (adulteration) and 30/8 (misbranding); WI Stat. § 94.72 (8) (adulteration and misbranding).

40.   Pet food manufacturers may fail to comply with state and federal laws governing adulteration and misbranding in some of the following ways: (1) producing pet foods that contain poisonous substances like pentobarbital used to euthanize animals; (2) preparing, packaging and holding pet foods in unsanitary facilities that contaminate them; (3) using non-slaughtered animals that may be diseased, decomposed or euthanized; and (4) substituting other ingredients like beef, horse or pig and selling them under a different name.

41.   Many manufacturers, including Evanger's, use meat from animals that are not USDA-inspected, human-grade and have died by means other than slaughter in their pet foods, including animals that were euthanized using pentobarbital. This practice has killed and sickened companion animals and put other animals and humans' health and safety at risk.

## II.   RECENT PET FOOD SCANDALS HAVE CAUSED CUSTOMERS TO BECOME MORE INFORMED ABOUT THE PRODUCTS THEY PURCHASE

42.   The lack of compliance with regulations has caused the industry to come under fire in recent years following scandals that have had the result of killing and sickening pets across the country and world.

43.   In 2002, the FDA reported on its investigation into the presence of pentobarbital in pet foods following reports from veterinarians that pentobarbital, used as an anesthetizing agent for dogs and other animals seemed to be losing its effectiveness in dogs. The FDA stated that because pentobarbital is routinely used to euthanize animals, the most likely way it could get into dog food would be in rendered animal products. Rendered products come from a process that converts animal tissues to feed ingredients, including tissues from animals that have been

euthanized, decomposed or were diseased. The FDA found that pentobarbital from euthanized animals survives the rendering process and could be present in the rendered feed ingredients used in pet food. The FDA's testing of dry dog food confirmed some samples contained pentobarbital. The FDA concluded that pentobarbital was entering pet foods from euthanized, rendered cattle or horses because of the lack of dog and cat DNA.[8]

44.   Despite its findings, the FDA has not aggressively taken action under FDCA, § 342 (a)(1) or (5), against the pet food companies that it found to have used non-slaughtered animals and contain pentobarbital in their pet foods. Therefore, manufacturers in the pet food industry, including Defendants, have continued their illegal practice of using non-slaughtered animals that may contain poisonous substances, like pentobarbital, in their pet foods.

45.   In March 2007, another pet food scandal rattled consumers, when pet food manufacturer Menu Foods alerted the FDA to animal deaths from its routine taste trials, which was followed by numerous consumer and veterinarian reports of many more pet deaths and sickness related to Menu Foods. These animals were reported to have developed kidney failure after eating certain pet food produced at Menu Foods' facilities.[9]

46.   FDA laboratories found melamine and melamine-related compounds labeled as wheat gluten and rice protein concentrate imported from China and used as ingredients in Menu Food's products. Cornell University scientists also found

---

[8] FDA, Food and Drug Administration/Center for Veterinary Medicine Report on the Risk from Pentobarbital in Dog Food, February 28, 2002, https://www.fda.gov/aboutfda/centersoffices/officeoffoods/cvm/cvmfoiaelectronicreadingroom/ucm129131.htm (last visited April 26, 2017).

[9] FDA, Melamine Pet Food Recall-Frequently Asked Questions, https://www.fda.gov/animalveterinary/safetyhealth/recallswithdrawals/ucm129932.htm (last visited April 20, 2017).

melamine in the urine and kidneys of deceased cats that were part of a taste-testing study conducted for Menu Foods. The combination of melamine and cyanuric acid in pet foods form crystals in urine and kidney tissue, which can lead to kidney failure and cause animal sickness and death. Over 150 brands of pet foods manufactured by Menu Foods were recalled and numerous lawsuits were filed, including a class action that settled for tens of millions to compensate pet owners for their veterinarian costs, pet loss and purchases. *Id.*

47. After being indicted on criminal charges for importing the contaminated pet-food ingredients used by Menu Foods that sickened and killed thousands of family pets in 2007, the company responsible, ChemNutra, Inc. and its owners pled guilty and were sentenced to probation and a company fine of $25,000, after also agreeing to pay part of the class action settlement.[10]

48. Again, beginning in 2007, the FDA began repeatedly issuing alerts to consumers about reports it had received concerning jerky treats that were made in China causing illnesses involving 3,600 dogs and 10 cats in the U.S. and resulting in approximately 580 deaths. However, after conducting more than 1,200 tests, visiting jerky pet treat manufacturers in China, and collaborating with colleagues in academia, industry, state labs and foreign governments, the FDA was unable to determine the cause of the illnesses.[11]

49. In 2013, after a New York State lab reported finding evidence of up to six drugs in certain jerky pet treats made in China, a number of jerky pet treat

---

[10] The VIN News Service, Sentences Handed Down in Pet Food Poisoning Criminal Case, Feb. 9, 2010, http://news.vin.com/vinnews.aspx?articleId=14984rticleId=14984 (last visited April 21, 2017).

[11] FDA, Why Are Jerky Treats Making Pets Sick? https://www.fda.gov/ForConsumers/ConsumerUpdates/ ucm371413.htm (last visited April 20, 2017).

products were removed from the market, and there was a corresponding decrease in reports of jerky-suspected illnesses. *Id*.

50.  In 2014, The Blue Buffalo Company Ltd. was sued by Nestle Purina Petcare Company ("Nestle") (*Nestle Purina Petcare Company v. The Blue Buffalo Company Ltd*., 4:14-cv-00859-RWS (E.D. Mo.)), for falsely stating that it did not have any animal by-products in its pet food. When it was uncovered that Nestle was correct and a supplier was providing meat by-product used in Blue Buffalo's pet food that was falsely labeled as otherwise, customers also sued in a class action, (*In re Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation*, No. 14-md-02562-RWS (E.D. Mo. Dec. 21, 2015)), resulting in tens of millions in a settlement for customers mislead by the false advertising.

51.  Blue Buffalo's supplier, Wilbur-Ellis and its employee, now face criminal charges in federal court and accusations of introducing adulterated food into interstate commerce, and misbranding its products by using too many lower-quality ingredients, such as chicken feathers, and not enough real chicken and other meat.[12]

## III.   EVANGER'S MARKETS ITS PET FOODS TO INGREDIENT-CONSCIOUS CUSTOMERS

52.  In the wake of uncertainty about the safety and labeling of pet food, consumers have increasingly become more aware and cautious about the products they purchase.

53.  Recognizing the market for informed customers, who want to purchase products that come from the United States and are safe and contain high quality

---

[12] St. Louis Post Dispatch, Pet Food Supplier Accused of Too Many Chicken Feathers, Not Enough Chicken, March 7, 2017, http://www.stltoday.com/business/local/pet-food-supplier-accused-of-too-many-chicken-feathers-not/article_b88af797-c3fe-56d1-a682-2c870a5669fb.html (last visited April 20, 2017).

ingredients, Defendants advertises and labels its products in this way in order to entice these customers, including Plaintiffs, to purchase its Pet Food for their pets. Exhibit B, listing of Defendants's Pet Foods.

54.  Evanger's has been an independent business for over 80 years, owned by the Sher family since 2002, with a self-proclaimed mission to develop "quality" products for companion pets. It specifically says that it "sell[s] *our products exclusively through independent neighborhood pet shops where quality and customer service are of the utmost importance*."[13]  Plaintiffs purchased Defendants's Pet Foods at an independent, local pet store, called Healthier Choices.

55.  The publicity surrounding Menu Foods and similar scandals allowed Defendants to capitalize on the opportunity to promote itself as a producer of healthier, safe, alternative pet foods.  Some small, independent pet food companies, including Party Animal, in the wake of recalls, decided to partner with Evanger's to make their organic pet food. Shawna Abrams, one of the co-owners of Party Animal, said at the time that "marketing our new food to retailers would have been a tougher sell, but *with news of the recall [of Menu Foods' pet food], suddenly everyone wanted untainted, natural food like ours*."[14]

56.  On the home page of its website, as recently as February 17, 2017, Evanger's prominently stated that "Healthy Food Makes Happy Pets," "No additives, artificial ingredients, or preservative," "The Evanger's Difference" is:



_____

[13] Evanger's, About Us, https://evangersdogfood.com/about-us/ (last visited April 27, 2017).

[14] Pet Product News, Business Builder: Private Labels Profit Potential, April 17, 2015 http://www.petproductnews.com/April-2015/Business-Builder-Private-Labels-Profit-Potential/ (last visited April 25, 2017) (emphasis added).

Evanger's, Home, https://evangersdogfood.com/ (last visited February 17, 2017) (emphasis added). As of the filing of this complaint this language has been removed.

57.  In describing its products, Evanger's stated as recently as February 17, 2017, that it only uses quality, all-natural, "**human-grade USDA inspected meats,**" stating, in pertinent part:

> Evanger's utilizes **human-grade USDA inspected meats** to make highly palatable and nutritious foods that will satisfy even the most finicky eater. With no soy, corn, wheat, artificial ingredients, **harmful additives**, preservatives or by-products, Evanger's canned meals make an excellent mixer to our dry foods. Not only do they offer your pet a variety in taste, our **gourmet dinners** offer the additional nutritional benefits your pet needs. Natural Vitamins and minerals are blended with the all-natural meats for ultimate nutrition that are completely balanced meals for all life stages, ages, and breeds.
>
> Our **Hand Packed Edition is a monumental improvement in canned dog and cat foods**. We have taken our **extraordinary product and made it even better** by filling each can individually with one pair of hands, instead of machines. The benefit of this process is that you, the consumer, can actually **see the quality ingredients in its original form**; **whole, pure meats** and fresh vegetables without any additives or by products. Your pets will think they are being treated like kings and queens!
>
> Since the 2003 addition of the Hand Packed foods, Evanger's family of foods has expanded to include the following groups of **exceptional foods and treats** . . .
>
> Manufacturing Process
>
> Evanger's cans are packed with **natural, raw ingredients in their own**

*natural juices*. The ingredients are then cooked entirely inside the sealed can to lock in the nutrients and flavor of each variety. This process assures both **wholesome nutrition for long life and good health**, plus the great taste your dog and cat will love. Naturally the best![15]

58. In order to attract other companies' brands to its manufacturing, Evanger's touts its use of "the highest quality of pet food available," and that "[b]y **working closely with local suppliers, we are able to keep raw material prices steady while delivering top quality products**.[16]

59. Evanger's co-owner, Chelsea Sher, responded about six months to a customer's question posted on the Hunk of Beef page that Evanger's quality is assured by its hand-selection of meats and suppliers and inspections for freshness and quality:



---

[15] Evanger's, About Our Products, https://evangersdogfood.com/about-us/about-our-products/ (last visited February 17, 2017) (emphasis added). As of the filing of this complaint, the words "human grade" have been removed from this page although Evanger's continues to maintain that its products are "**USDA inspected**."

[16] Evanger's, Private Label Services, https://evangersdogfood.com/about-us/private-label-services/ (last visited April 27, 2017) (emphasis added).

1   Evanger's, Hunk of Beef, https://evangersdogfood.com/product/20109/ (last visited
2   April 27, 2017).

3      60.   Evanger's has close, long standing relationships with its suppliers, some
4   for over forty years, including the supplier of its Hunk of Beef and Pulled Pork.[17]

5      61.   As recently as February 9, 2017, Evanger's touted that its "Grain Free
6   Hand Packed" specialties, including Hunk of Beef and Braised Beef, with "fresh,
7   natural and superior ingredients (no by-products) ensure *quality on a human-grade*
8   *level*." It states that its cooking process softens its recipes with bones making them
9   "*edible*, *safe*, *wholesome* and highly digestible."[18]

10     62.   Evanger's touts that Hunk of Beef is its best seller, and that it sells more
11  than one million cans of a year. It labels Hunk of Beef as "100% beef," "cRc Kosher
12  for Passover," with a picture of a human steak dinner, and the statement "Foodies
13  Choice" typically used to describe picky people, who only eat what they consider
14  the best quality and tasting foods,[19]:

15

16

17

18

19

---

[17] Evanger's, Voluntary Recall, posted February 3, 3017,
https://evangersdogfood.com/news-events/pug-family-updates/ (last visited
February 17, 2017) (since removed).

[18] Evanger's, Dog Food, Grain Free Hand Packed,
https://evangersdogfood.com/dog-food/grain-free-hand-packed/ (last visited
February 9, 2017) (emphasis added). As of the date of this complaint, the words
"human grade level" have been removed.

[19] Evanger's, Voluntary Recall, posted January 4, 2017,
http://evangersdogfood.com/news-events/pug-family-updates/ (last visited
February 17, 2017) (since removed).



**HUNK OF BEEF – PACKED BY HAND!**

★★★★★

Premium tender 100% beef roast cooked
in its own juices serves up a meaty
supplement.

**$ 36.91**

63.   Evanger's also offered its Braised Beef as uncut pieces of meat in gravy, with a label that says "100% Beef Meat" and a picture of a human steak meal:



**BRAISED BEEF CHUNKS
WITH GRAVY PACKED BY
HAND!**

A hearty dinner of tender chunks of beef
with market fresh vegetables of peas and
carrots together with nutritious gravy.
Grain Free!

**$ 36.91**

- 22 -

1

2

3

64.   On its website, Evanger's posted a video of Defendants's co-owner, Chelsea Sher, touting its "people food for pets," in which she eats some Hunk of Beef to show that it is edible by people[20]:

4

5

6

7

8

9

10

11



12

13

14

15

16

17

65.   In addition to its Hand Packed lines, Evanger's also carries an "***Organic People Food for Pets***" line certified by Oregon Tilth for its "handling" process. Oregon Tilth permits non-organic products on the same line as organic products if there are sufficient measures and procedures in place, including cleaning and sanitation, to protect organic product from contamination or commingling of any non-organic material[21]:

18

19

20

21

22

23

24

25

[20] Evanger's, News & Events, Chelsea Sher Eats Evanger's Dog Food, Published on You Tube August 25, 2015, https://evangersdogfood.com/news-events/recent-press/ and https://youtu.be/RQekr7QtSiI (last visited May 15, 2017).

26

27

[21] Oregon Tilth, Processing and Handling FAQ, https://tilth.org/app/uploads/2014/12/BrandsMarketersManufacturersFAQ.pdf (last visited May 2, 2017).

28

Organic People Food for Pets!





**100% ORGANIC COOKED CHICKEN**

★★★★★

A whole dressed organic chicken simmered in natural well water is a wonderful healthy supplement

**ORGANIC TURKEY WITH POTATO & CARROTS DINNER**

★★★★★

Organic turkey with organic market-fresh vegetables create a wholesome dinner.

66.   Evanger's provides display materials to retailers to place in their stores next to Defendants's products, without specifying the precise products to which they apply, which advertise Evanger's as "Green," "USDA Organic" - subject to the same requirements as human food, "Oregon Tilth" certified, and similar to organic standards, in order to entice customers to purchase them:



67.   Evanger's offers other "all-natural, meat-based" pet foods for dogs, cats and ferrets with "no by-products, additives or preservatives." In addition to its Grain Free Hand Packed and Organics lines, Evanger's offers Classic Line, Dry Foods, Grain Free Game Meats, Nothing but Natural – "made of 100% whole muscle meat," Signature Series, Super Premium – that are "completely balanced, highly nutritious, great tasting, innovative meals" and "holistic," Jerky Treats, Freeze Dried Treats and Ferret food.[22]

68.   Evanger's states that is "100% committed to the safety of its products."[23]

69.   Similar to Evanger's brand name, its Against the Grain brand also touts its "carefully selected," "highest quality," "human grade," "meat-based" Pet Foods:

85% Meat. 0% Grain.

Because dogs and cats are primarily carnivores, we have designed all of our formulations to include at least 85% meat. But not only do we make ***meat-dominant foods, but our proteins are all of high quality, and only sourced from <u>human grade facilities</u>***. They never contain growth hormones and are anti-biotic free. To show you how proud we are of ***our carefully selected ingredients***, we do not make a traditional, loaf-style food. Instead, we hand fill all of our canned foods so that ***you can see the quality of our hand pulled meats*** and fresh caught fish right when you open a can of Against the Grain pet foods, ***instead of "mystery meat*** ."

Our Mission.

Our mission is to ***improve the health and quality of life of our companion pets*** through the development of the ***safest***, most nutritious, and palatable pet

---

[22] Evanger's, About Us, Product Guide, https://evangersdogfood.com/about-us/product-guide/ (last visited May 2, 2017).

[23] Evanger's, News, Voluntary Recall, https://evangersdogfood.com/news-events/updates/ (last visited April 27, 2017).

products available. We believe that our **high quality products** should not only sustain our companion pets, but our emphasis on palatability also increases their enjoyment of life—like you and I.

All That.

Instead of conforming to all other pet food companies' traditions of making foods, who use a top-down approach when creating pet food, Against the Grain started with a bottom-up approach. We first asked, "What is the best pet food that can be made, then how do we make it." The end result offers the smartest choice for a **healthy** and happy pet. All of foods are **minimally processed at our own factories**, and all processing methods are designed to ensure that the integrity of the proteins, vitamins, and natural enzymes are maintained.

Against the Grain **uses all fresh ingredients**, and has designed all foods to be grain-free and gluten-free. We NEVER use corn, wheat, or soy. We have taken steps to use sustainable and green resources; our fresh-caught fish-based cat canned foods are dolphin-safe and turtle-safe. Our meat products are all GMO and anti-biotic free. Finally, we use the maximum amount of recyclable materials in our retail packaging, and use strictly skylights in our manufacturing plant.[24]

70.  In describing why it started Against the Grain, Evanger's states that it wanted to make Pet Foods that were "second to none" with its number one criteria being "SAFETY." It boasts that unlike other brands, it owns its manufacturing

---

[24] Against the Grain, About the Food, http://www.againstthegrainpetfood.com/about-the-food/ (last visited May 2, 2017) (emphasis added).

1  facility and produces its own products that gives it accessibility and the ability to

2  create unique and innovative products.[25]

3      71.   Against the Grain brand has three lines of Pet Foods, Super Food, Pulled

4  Meat Dog Food and Canned Cat Food. It *continues* to state that its Canned Cat Food

5  is:



8  Against the Grain, Canned Cat Food, http://www.againstthegrainpet_food.com

9  /human-quality-cat-food/ (last visited May 2, 2017).

10      72.   As recently as February 17, 2017, Against the Grain stated that its Pulled

11  Meat Dog Foods, including Pulled Beef, were "***human grade***":

17  Against         the         Grain,         Pulled         Meat         Dog         Foods,

18  http://www.againstthegrainpetfood.com/pulled-meat-dog-food/ (last visited Feb. 17,

19  2017). As of the filing of this complaint the words "human grade" have been

20  removed.

21      73.   Evanger's also manufacturers pet foods for Party Animal, which makes

22  similar representations about its organic pet food, including that it uses the "best"

23  and "healthiest" ingredients in its products.[26]

[25] Against the Grain, About Us, http://www.againstthegrainpetfood.com/about-us/
(last May 2, 2017) (capitalization in original).

[26] Party Animal, Our Story and FAQ, http://partyanimalpetfood.com/ (last visited
May 3, 2017).

74.  On its website, Party Animal details the USDA's National Organic Program which requires that, in pertinent part:

> organic ingredients are free of pesticides, synthetic fertilizers, antibiotics, growth hormones, GMO's (genetically modified organisms), by-products, artificial colors, flavors and preservatives. Organic livestock may not be given antibiotics, growth hormones or any animal-byproducts. They can only be fed organic feed and must have access to the outdoors. All certified USDA organic pet products must **meet the same USDA requirements as human food**.
>
> *          *          *          *
>
> A complete breakdown of our formula, including **sources of each ingredient** is required as part of the organic certifying agency's review and approval process. This independent third-party review and approval process is unique in pet food/treats.

*Id.* (emphasis added).

75.  Party Animal also states that some of its products are labeled certified by Oregon Tilth, which "inspects [its] production facility and reviews each ingredient used in our organic formulas . . . including sources of each ingredient is required as part of the agency's review and approval process to certify that the federal organic standards are met." *Id.*

76. Party Animal's Cocolicious line states that its products are USDA organic certified, including its beef and contain "no junk or weird stuff," including Cocolicious Organic Beef & Turkey dog food and Cocolicious Organic Chicken & Beef:



Party Animal, Cocolicious Organic Beef & Turkey, http://partyanimalpetfood.com/?portfolio=cocolicious-organic-beef-turkey (last visited May 3, 2017).

Party Animal, Cocolicious Organic Chicken & Beef, http://partyanimalpetfood.com/?portfolio=cocolicious-organic-chicken-beef (last visited May 3, 2017).

### III.   EVANGER'S HISTORY WITH REGULATORS AND THE LAW

77. Since 2002, when the Shers purchased Evanger's, the company has been plagued by issues with regulators, law enforcement and lawsuits. After numerous complaints from residents about its putrid odor, in 2006, the Village of Wheeling, Illinois, filed a lawsuit against Evanger's for violation of several ordinances relating

to sanitation, rotting meat, sewage and insects. After many years of litigation and continued problems at Evanger's facility, which even forced the relocation of a children's summer camp, the state appellate court affirmed a trial court's granting of summary judgment in favor of the Village of Wheeling, and ordered Evanger's to pay $316,500 in restitution. *The Village of Wheeling v. Evanger's Dog and Cat Food Co., Inc*., No. 06 MC3 013933-01, 2012 IL App (1st) 113100-U (Nov. 28, 2012).

78.   Evanger's is also no stranger to the FDA. On April 24, 2008, the FDA issued an order requiring Evanger's to obtain an emergency permit from the agency before its canned pet food products could enter interstate commerce, after an inspection found "significant deviations from prescribed documentation of processes, equipment, and recordkeeping" in its canned food production. The FDA indicated that these problems "could result in under-processed pet foods, which can allow the survival and growth of Clostridium botulinum (C. botulinum), a bacterium that causes botulism in some animals as well as in humans."[27]

79.   The FDA initially approved a temporary emergency permit, based on a finding that Evanger's had taken corrective actions to address these issues. However, shortly thereafter, in June 2009, the FDA revoked the permit after FDA inspections determined that Evanger's was not operating in compliance with the permit's mandatory requirements and conditions. [28]

80.   In May 2011, the FDA revisited Evanger's. This time the FDA issued a warning letter to Evanger's, finding that its Lamb and Rice and Grain Free Duck Pet

---

[27] FDA, FDA Orders Pet Food Maker to Obtain Emergency Operating Permit, dated April 24, 2008, https://wayback.archive-it.org/7993/20170114031812/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2008/ucm116886.htm (last visited May 15, 2017).

[28] North Carolina Academy of Small Animal Medicine, Recalls,  FDA Suspends Temporary Emergency Permit of Pet Food Maker, dated June 12, 2009, http://www.ncasam.org/educator/article/349/ (last visited May 15, 2017).

Foods were adulterated and misbranded in violation of federal law because they did not contain any lamb or duck, respectively. The FDA also stated that Evanger's failed to provide processing and production records upon written demand as required.[29]

81. Evanger's problems do not stop with its Pet Food; it has also been accused of failing to properly pay its employees pursuant to federal law. In January 2009, several employees filed a class action lawsuit against the company, *Barragan et al. v. Evanger's Dog and Cat Food Co., Inc.*, 1:09-cv-00227 (N.D. Ill. Jan. 13, 2009), alleging that they were not paid overtime in violation of the federal Fair Labor Standards Act. After the court granted certification to the class, the parties agreed to settle, and the court granted final approval of the settlement in September 15, 2010. *Barrangan*, Docket 87 (entered Sept. 17, 2017).

82. Aside from their entanglements with regulators and civil lawsuits, Evanger's owners, Holly and Joel Sher, have been convicted of criminal activity. In May 2010, they were arrested and charged with felony theft and money laundering for stealing almost $2 million in utilities for Evanger's pet food manufacturing plant. The prosecutor commented that the Shers showed a callous disregard for their employees' safety by exposing them to dangerous situations over many years in the course of orchestrating their utility theft scheme.[30]

---

[29] FDA, Evanger's Dog & Cat Food Company, Inc. 5/5/11, dated May 5, 2011, https://wayback.archive-it.org/7993/20170112193647/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm255000.htm (last visited May 15, 2017).

[30] Chicago Tribune, Lincolnwood couple charged in utility theft scheme, March 25, 2010, http://articles.chicagotribune.com/2010-03-25/news/ct-met-electricity-theft-0325-20100325_1_nicor-gas-gas-meters-joel-sher (last visited May 15, 2017).

83.   During the utility theft litigation, in 2013, Joel Sher was charged with subornation of perjury, bribery and communicating with a witness when he tried to bribe a witness to change his testimony for $5,000.[31]

## IV.   DEFENDANTS'S PET FOOD POISONS PLAINTIFFS' PETS AND ONE PET DIES

84.   Relying on Defendants's marketing and advertising of its products, Plaintiffs purchased Defendants's Pet Foods for four years as a treat for their five dogs. On New Year's Eve, December 31, 2016, Plaintiff Nicole Mael purchased several of Evanger's products at her local pet food store, Healthier Choices, including cans of Hunk of Beef and Pulled Beef.

85.   Immediately after her five dogs consumed the Hunk of Beef, they began acting intoxicated and non-responsive - suffering from acute neurological symptoms. Plaintiffs rushed them to an emergency vet. One of their dogs, Talula died from the poisoning from the Hunk of Beef the next day, January 1, 2017. The other four have undergone continued veterinary care, including Tito, who remains on seizure medication.[32]

86.   After Talula's death, Plaintiffs, working with the FDA, requested that a necropsy be performed on the animal's body to determine the cause of death. The necropsy was performed at Oregon State University Veterinary Diagnostic

---

[31] Chicago Tribune, Man accused of trying to bribe witness, Feb. 9, 2013, http://articles.chicagotribune.com/2013-02-09/news/chi-man-accused-of-trying-to-bribe-witness-20130209_1_bribe-witness-power-lines-gas-flow (last visited May 15, 2017).

[32] FDA, CVM Updates, FDA Cautions Pet Owners and Caretakers Not to Feed Certain Evanger's or Against the Grain Canned Pet Foods Due to Adulteration with Pentobarbital ("FDA Caution"), posted February 17, 2017 https://www.fda.gov/AnimalVeterinary/NewsEvents/CVMUpdates/ucm 542265.htm (last visited May 9, 2017).

Laboratory ("OSU"), on January 3, 2017. The necropsy found "partially digested kibble," and it could not rule out neurotoxicocis until the stomach contents and remaining can of Hunk of Beef were tested. Exhibit C, OSU, Case Summary at 1.

87.   On January 3, 2017, after Talula's death and neurotoxicocis not being ruled out in the necropsy, while awaiting further testing results of Talula's stomach and the Pet Foods, Plaintiff Nicole Mael emailed Brett Sher at Evanger's, and included the FDA in the communication, to provide notice of the issue as follows:

> I wanted to contact you and let you know my 5 dogs became ill after eating Evangers hunk of Beef with A Jus. The lot number is 181 6E O6HB 13 exp June 2020. Please, please recall this food so no other person goes through what I am going through. Nikki Mael

88.   The FDA directed that further testing of the animal's stomach contents and the remaining un-opened cans of Hunk of Beef be performed at Michigan State University, Diagnostic Center for Population and Animal Health ("MSU"). On January 17, 2017, MSU clinical toxicologist John P. Buchweitz performed the testing, and confirmed that both the Hunk of Beef dog food and Talula's stomach contents tested positive for "large quantity chromatographically" of pentobarbital. On January 23, 2017, Dr. Buchweitz notified OSU and Plaintiffs of the results. He requested that Plaintiffs send the opened can of the Hunk of Beef for testing. Exhibit C, MSU, Toxicology at 1-2.

89.   On January 26, 2017, the FDA notified Plaintiffs that the un-opened Hunk of Beef dog food also tested positive for an "abundant amount" of pentobarbital. *See* Exhibit C, OSU, Case Summary at 2 and MSU, Toxicology at 1.

90.   The FDA testing confirmed that Talula's stomach contents, an open can of Hunk of Beef fed to Plaintiffs' pets, and unopened cans of Against the Grain

and Hunk of Beef purchased by Plaintiffs and from the retailer, Healthier Choices, where Plaintiffs purchased their pet food, **all** contained pentobarbital.[33]

91.  As of the filing of this complaint, Plaintiffs have expended over $6,000.00 on veterinary care relating to their pets eating Hunk of Beef, including but not limited to emergency hospitalization in attempts to save their pets' lives, ongoing monitoring and medications.

92.  In addition to the estimated thousands of dollars that Plaintiffs have spent purchasing Evanger's Pet Foods over the last four years, Plaintiffs have spent an average of $100 a week on making their own food for their pets to ensure that it is healthy and safe.

## V.   FDA'S INVESTIGATION CONFIRMS PENTOBARBITAL IN EVANGER'S PET FOODS AND LEADS TO PRODUCT RECALLS

93.  In addition to the aforementioned testing involving Talula and Plaintiffs' can of Hunk of Beef, the FDA performed additional testing of Defendants' Pet Foods and investigated Defendants' facilities. The testing and investigations further confirmed the adulteration of Evanger's Pet Foods and misrepresentations to customers.

94.  On January 10, 2017, the FDA began inspections of Evanger's production facilities. During this inspection, it collected and tested two cans of Against the Grain's Pulled Beef that also tested positive for pentobarbital.[34]

---

[33] FDA Caution, https://www.fda.gov/AnimalVeterinary/NewsEvents/CVM Updates/ucm542265.htm (last visited April 25, 2017); Exhibit C, OSU report at 2 (Addendum 1/23/17 "Testing of the feed and stomach contents has found pentobarbital") and MSU report at 1 (feed and stomach contents "positive" for "pentobarbital (euthanasia agent –large quantity chromatographically) "If this sample came directly from a can, this is an urgent matter and needs to be reported to the FDA Feed Safety Portal.")

[34] FDA Q&A, https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafety

95.   In its review of Defendants' records, the FDA found the bill of lading of Evanger's meat supplier stating it was "Inedible Hand Deboned Beef" "FOR PET FOOD USE ONLY. NOT FIT FOR HUMAN CONSUMPTION." The FDA determined that the supplier "does ***not*** have a grant of inspection [or inspection mark] from the United States Department of Agriculture's Food Safety Inspection Service" and "would ***not*** be considered human grade." The FDA also indicated that the supplier's export certification under APHIS was not active or valid. "The FDA's preliminary assessment indicates that ***none*** of [Evanger's] suppliers are USDA-FSIS registered facilities."[35]

96.   The FDA published its observations in a "Form 483", which "noted numerous significant concerns with conditions" from its inspection of Evanger's facilities in Wheeling, Illinois, and Nutripack, LLC in Markham, Illinois, where Joel Sher is listed as the President and Manager, respectively.[36]

97.   The inspection report for Defendants' Wheeling facility revealed that cans of Hunk of Beef and Pulled Beef from that facility tested positive for pentobarbital. It also noted condensation dripping into its cans of Pet Foods, including Hunk of Beef. It described pools of water, peeling paint, mold, and live fly-like insect where Pet Food was exposed. It also noted an open sanitary sewer within 25 feet of food storage and processing. The FDA noted a lack of refrigerated storage facilities or other means of controlling the temperature of exposed raw meat that were instead stored at ambient temperature. The FDA also noted "frozen ice containing a blood-like substance across the floors of the three trailers, and also on

---

Informaton/ucm544348.htm (last visited May 9, 2017).

[35] *Id.* (emphasis added).

[36] FDA Cautions, https://www.fda.gov/AnimalVeterinary/NewsEvents/CVM Updates/ucm542265.htm; Exhibit D, Form 483 FDA Inspections of Evanger's facilities.

the ground immediately outside of two of the trailer doors." Exhibit D, Wheeling facility Form 483.

98.   The inspection report for Evanger's Markham facility likewise indicated that Pulled Beef tested positive for pentobarbital. It also stated that this facility's Pet Foods are adulterated where they were prepared, packed, or held under insanitary conditions that may have contaminated them or made them unhealthy. The FDA noted that, on four different dates, condensation was dripping throughout the processing and storage facility and into open cans of Pet Food, and that the floor was damaged in a manner that caused pools of water to form. The report stated that frozen and raw meats were prepared for processing while having direct contact with insanitary, bare, paint peeling and unprotected concrete flooring. The report noted that employees were cutting raw chicken parts on untreated wooden building construction lumber. The report observed birds feeding on spilled pet food, resting in rafters and flying throughout the warehouse. Exhibit D, Markham facility Form 483.

99.   The FDA confirmed at the time that it had received ten complaints, which it was continuing to follow up on, regarding Evanger's products, including five suggesting pentobarbital poisoning involving Hunk of Beef *and Braised Beef*.[37]

100. USDA-FSIS also tested Hunk of Beef products, and found the meat was bovine (beef) with "trace amounts" of pork and equine.[38]

101. The FDA encourages facilities to initiate a voluntary recall and to update the product involved in the recall as more information becomes available. It also states that "it is *not* acceptable to use animals euthanized with a chemical substance

---

[37] FDA Q&A, https://www.fda.gov/AnimalVeterinary/SafetyHealth/Product SafetyInformation/ ucm544348.htm.

[38] FDA Caution, https://www.fda.gov/AnimalVeterinary/NewsEvents/CVM Updates/ucm542265.htm.

in pet or other animal foods" and that there is **no** acceptable level of pentobarbital in pet food. It also noted that due to the irregular distribution of meat from various animals in the "chunk of beef" products, that "if even one can tests positive for pentobarbital, we have to consider the possibility that some, but not necessarily all other cans in that lot will also test positive."[39]

102. On February 3, 2017, following discussion with the FDA, Evanger's initiated a voluntary recall of certain lots of Hunk of Beef: 1816E03HB, 1816E04HB, 1816E06HB, 1816E07HB and 1816E13HB with an expiration date of June 2020. The lots were distributed to fifteen states, Washington, California, Minnesota, Illinois, Indiana, Michigan, Wisconsin, Ohio, Pennsylvania, New York, Massachusetts, Maryland, South Carolina, Georgia and Florida.[40]

103. On February 9, 2017, after the FDA's test of two cans of Against the Grain's Pulled Beef were positive for pentobarbital from the same Evanger's facility, and after discussions with the FDA, Evanger's initiated a voluntary recall of Pulled Beef lot 2415E01ATB12, with an expiration date of December 2019, manufactured and distributed in December 2015 to Washington and Maryland, which it announced publicly on February 13, 2017.[41]

---

[39] FDA Q&A, https://www.fda.gov/AnimalVeterinary/SafetyHealth/Product SafetyInformation/ ucm544348.htm (emphasis added).

[40] FDA, Recalls, Market Withdrawals, & Safety Alerts, Evanger's Voluntarily Recalls Hunk of Beef Because of Pentobarbital Exposure in one Batch of Food, February 3, 2017 ("Hunk of Beef Recall Feb. 3, 2017"), https://www.fda.gov/ Safety/Recalls/ucm539900.htm (last visited May 11, 2017); FDA Caution, https://www.fda.gov/AnimalVeterinary/NewsEvents/CVMUpdates/ucm542265. htm.

[41] FDA Caution, posted February 17, 2017, htttps://www.fda.gov/Animal Veterinary/NewsEvents/CVM Updates/ucm542265.htm; FDA, Recalls, Market Withdrawals, & Safety Alerts, Against the Grain Pet Food Voluntarily Recalls One Lot of Pulled Beef Due to Potential Adulteration with Pentobarbital, February 14, 2017 ("Pulled Beef Recall Feb. 14, 2017"), https://www.fda.gov/Safety/Recalls/

1    104. On February 14, 2017, the FDA concluded that it was unable to

2    determine from Evanger's available records whether any of Evanger's other

3    products, or any products Evanger's makes for other companies, contained the beef

4    that went into the recalled products.[42]

5    105. On February 20, 2017, Evanger's notified the FDA that it planned to

6    recall *all* "chunk of beef" products.

7    106. On February 27, 2017, the FDA became aware that Evanger's was

8    notifying distributors and retailers of a new recall for its ***Braised Beef***, bar code

9    20107, without explanation, as well as ***expanding the prior recall*** of Hunk of Beef,

10   bar code 20109, and Pulled Beef, bar code 80001, manufactured from December

11   2015 to January 2017, with expiration dates December 2019 to January 2021.[43]

12   107. Upon information and belief, Evanger's has not provided customers who

13   purchased its Pet Foods with a refund based upon the value of the products purchased

14   and not returned.

15   108. Upon information and belief, retailers also were not given a refund for

16   the recalled products that were returned by customers, or for Evanger's other

17   products that retailers had been unable to sell following the recall.

18   109. On April 17, 2017, ***nearly four months*** after Plaintiffs' dogs were

19

---

20   ucm541692.htm (last visited May 11, 2017); Against the Grain, Voluntary Recall,
     htttp://www.againstthegrainpetfood.com/about_us/voluntary-recall/ (last visited

21   May 11, 2017).

22   [42] FDA Q&A, https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafety

23   Information/ucm544348.htm.

     [43] FDA Caution, updated March 2, 2017, htttps://www.fda.gov/AnimalVeterinary/

24   NewsEvents/CVM Updates/ucm542265.htm; FDA, Recalls, Market Withdrawals,

25   & Safety Alerts, Evanger's Pet Food and Against the Grain Voluntarily Recalls
     Additional Products Out of Abundance of Caution due to Potential Adulteration

26   with Pentobarbital, March 3, 2017 ("Expanded Recall Mar. 3, 2017"),

27   http://www.fda.gov/Safety/Recalls/ucm544972.htm (last visited May 11, 2017).

28

poisoned by Evanger's Pet Foods, another company's brand made my Evanger's in 2015 was recalled. After a dog became sick from eating Party Animal's products, and testing from Texas A&M confirmed that Cocolicious Beef & Turkey dog food (Lot #0134E15204 04, best by July 2019) and Cocolicious Chicken & Beef dog food (Lot #0134E15237 13, best by August 2019) ("Cocolicious Beef Products") contained pentobarbital, Party Animal initiated a recall. Party Animal indicated that it is working with distributors and retailers to determine if any additional beef-flavored products remain on shelves. It also stated that it is having "extensive discussions" with Evanger's regarding the cause of the contamination of its pet food and re-examining its manufacturing processes.[44]

## VI.   EVANGER'S PET FOODS ARE DECEPTIVELY AND FALSELY LABELED

### A. <u>Evanger's Denials Further Misrepresent Its Pet Foods</u>

110. On January 4, 2017, while Plaintiffs were working with the FDA to test the Pet Foods and Talula's stomach contents, Evanger's posted on its website that the lot #1816E06HB13 went to only one distributor in Washington. Even though it later recalled all its lots of Hunk of Beef as well as Braised Beef and Pulled Beef, Evanger's stated that no other flavors of its Pet Foods were affected, and that all other products "are entirely safe to feed your and our own pets." Evanger's also maintained that every batch of its Pet Foods "is reviewed by a graduate from the FDA Better Processing School" and is cooked in compliance with "Evanger's FDA Scheduled File Process." Evanger's was also quick to cast blame on Plaintiffs without explanation or evidence stating "we have nothing to show that there is any issue with the food such as a veterinary report. We believe that ***other factors are***

---

[44] FDA, Recalls, Market Withdrawals, & Safety Alerts, Party Animal Recalls Dog Food Due to Potential Presence of Pentobarbital, Posted April 25, 2017 ("Party Animal Recall"), https://www.fda.gov/Safety/Recalls/ucm554771.htm (last visited May 11, 2017).

1

2

3

*involved* that we are not aware of at this time, but will come to light when we are able to have a dialogue with [Plaintiffs]. . . . we anticipate at the conclusion of our investigation the test results will come back negative for any pathogens or toxins."[45]

4

5

6

7

8

9

10

111. On January 16, 2017, six days after the FDA began inspecting Evanger's facilities and testing unopened cans of Pet Foods that it found adulterated, Evanger's posted on its website that its four preliminary tests all came back negative, and it expected its final results to be the same. Again, without explanation, Evanger's pointed fingers at Plaintiffs stating that it has been "unable to find any connection between the alleged incident and our foods, nor is there any veterinary or medical evidence to support the claims of responsibility."[46]

11

12

13

14

15

16

17

112. On January 23, 2017, at the same time that the FDA tests confirmed that Talula's stomach contents and Hunk of Beef had tested positive for pentobarbital (see Exhibit C), Evanger's again stated that its testing for commercial sterility came back "sterile," meaning it contained no pathogens or harmful bacteria. It thanked "everyone who waited for all the test results before drawing any conclusions." It again falsely claimed that it is a "5-star pet food that not only improves your pet's health, but overall well-being and longevity through clean, healthy food."[47]

18

19

20

21

22

113. On January 30, 2017, despite the FDA's ongoing testing that confirmed pentobarbital in its Pet Foods and investigation of Evanger's facilities at this time, Evanger's stated that it will not "respond to any *unverifiable reports or unsubstantiated rumors that are intended to deceive the public*" relating to the FDA and Evanger's Pet Foods. It falsely stated that the FDA has not completed any

23

24

25

[45] Evanger's, News-Events, Voluntary Recall ("Voluntary Recall on Website"), posted Jan. 4, 2017, https://evangersdogfood.com/news-events/pug-family-updates/ (last visited Feb. 17, 2017) (emphasis added) (since removed).

26

[46] *Id.*, posted Jan. 16, 2017.

27

[47] *Id.*, posted Jan. 23, 2017.

28

additional tests and "as far as Evanger's is aware and, we believe, the FDA is aware, ***none of our foods have been reported to contain pentobarbital*** or any other contaminant."[48]

114. In its February 3, 2017 recall notice, a month after Plaintiffs notified it of the issue, Evanger's stated that the recall only affects 5 lots of food, "which [are] specifically used for the Hunk of Beef product and ***no other products.***" The recall notice also stated, in pertinent part:

> All Evanger's suppliers of meat products are ***USDA approved***. The beef supplier provides us with beef chunks from cows that are slaughtered in a ***USDA facility***. . . Because we source from suppliers of meat products that are ***USDA approved***, and no other products have had any reported problems, we are not extending the recall to other supplier lots.[49]

115. On February 3, 2017, Evanger's stated on its website that it had terminated its relationship with its meat supplier of over forty years, and that the supplier's meat was ***not used in any other products***. Evanger's stated that it did not know about pentobarbital in its products, or test for it previously, because Evanger's does not have any rendered materials in its supply chain, which includes products from animals that have died by means other than slaughter, and further stated that "[a]ll of our raw materials are sourced from ***USDA-inspected facilities***, and many of them are suppliers with whom we have had long-standing relationships."[50]

116. On February 13, 2017, however, Evanger's recalled yet another product, one lot of Against the Grain Pulled Beef. Evanger's again stated that the recall

---

[48] *Id.*, posted Jan. 30, 2017 (emphasis added).

[49] Hunk of Beef Recall Feb. 3, 2017, https://www.fda/Safety/Recalls/ucm539900.htm (emphasis added).

[50] Voluntary Recall on Website, posted Feb. 3, 2017, https://evangersdogfood.com/news-events/pug-family-updates/ (emphasis added).

"affects *no other lot numbers*, and no other flavors" and reiterated that it makes "products that are of the best quality available for pets."[51]

117. On February 17, 2017, the FDA publicly corrected Evanger's misrepresentations that its beef comes from a "USDA approved" supplier. The FDA confirmed that the bill of lading *that the meat supplier provided to Evanger's* indicated that its beef was "*inedible hand deboned beef*" and "*not fit for human consumption*." The FDA stated that the supplier does not have a USDA grant of inspection nor a USDA inspection mark, and that the meat is not human grade. The FDA again stated that only USDA-FSIS regulates the slaughter of animals for human consumption, and USDA-FSIS did not inspect Evanger's meat supplier. It also stated that testing by USDA-FSIS found that Evanger's Hunk of Beef, labeled as "100% beef," contained trace amounts of pork and equine as well as beef.[52]

118. The FDA also reiterated in a "Q&A" about Evanger's that *none* of Evanger's suppliers are USDA-FSIS registered facilities.[53]

119. Despite the FDA's findings and public statements, as of the date of this complaint, Evanger's continues to make false representations on its website including, in the first sentence about its Pet Foods, that "Evanger's utilizes *USDA inspected meats* to make highly palatable and nutritious foods that will satisfy even the most finicky eater."[54]

120. The Against the Grain website also continues to mislead customers that

---

[51] Against the Grain, Voluntary Recall, http://www.againstthegrainpetfood.com/about_us/voluntary-recall/ (emphasis added).

[52] FDA Caution, https://www.fda.gov/AnimalVeterinary/NewsEvents/CVM Updates/ucm5 42265.htm.

[53] FDA Q&A, https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafety Information/ucm544348.htm.

[54] Evanger's. About Our Products, https://evangersdogfood.com/about-us/about-our-products/ (emphasis added).

1    its Pet Foods are "only sourced from ***human grade facilities***" and that its cat food is

2    "human quality."[55]

3    121. On March 3, 2017, after insisting that no other lots or products were

4    affected by its recalls, and two months after Plaintiffs first notified Evanger's of the

5    facts described above, Evanger's announced that it was expanding its recall to ***all***

6    lots of Hunk of Beef and Pulled Beef, and also including a new recall of all Evanger's

7    Braised Beef pet food, without explanation, manufactured between December 2015

8    and January 2017, with expiration dates of December 2019 through January 2021.

9    Evanger's stated that the "recall affects only Hand Packed Beef Products."[56]

10   122. Even after the expanded recall that Defendants stated did not affect any

11   other products, on April 17, 2017, another pet food manufactured by Evanger's,

12   Party Animal's Cocolicious Beef Products, sickened a dog and tested positive for

13   pentobarbital. Party Animal recalled its Cocolicious Beef Products.

14   123. On May 5, 2017, Party Animal sued Evanger's and Nutripack for

15   damages relating to the recall of its products. (*Party Animal, Inc. v. Evanger's Dog*

16   *and Cat Food Co., Inc., Nutripack, LLC, Does 1-100*, No. 2:17-cv-03422-PSG-FFM

17   (C.D. Cal.)) ("Party Animal Lawsuit"). In the lawsuit, Party Animal alleges that its

18   damages include but are not limited to retailers demanding refunds for recalled and

19   non-recalled products and consumers seeking payment of veterinarian bills for

20   treatment after their pets ate Party Animal's products.

21   124. The Party Animal Lawsuit also alleges that, in order to avoid liability

22   relating to the recalls, Defendants defunded Evanger's corporation and moved their

23

24   [55] Against the Grain, About the Food, http://www.againstthegrainpetfood.com/
25   about-the-food/ and Cat Food, http://www.againstthegrainpetfood.com/human-
     quality-cat-food/ (emphasis added).

26   [56] Expanded Recall Mar. 3, 2017, https://www.fda.gov/Safety/Recalls/ucm544972.
27   htm.

28

assets to Nutripack. Defendants invoiced Party Animal through Nutripack, instead of Evanger's as they had done for the last decade, beginning in February 2017. In a phone call between Party Animal and Holly Sher, an owner of Evanger's and Nutripack, in April 2017, Sher stated that "they were afraid of getting sued because of the recent recalls, and they were taking money out of Evanger's. She also stated that they did not want to receive any money into Evanger's and would instead run all operations under Nutripack."

125. Evanger's has not made any public comment about Party Animal, and it is unknown if other Evanger's and Against the Grain products or other companies' products that Evanger's makes might also be adulterated, misbranded and unsafe for pets and customers handling them.

**B. <u>Evanger's Admits to Misrepresentations of its Pet Foods in Lawsuit Against Its Meat Supplier</u>**

126. Despite its history of run-ins with FDA and other lawsuits, instead of owning up to its misleading advertising of its Pet Foods that poisoned and put at risk animals that consumed its products, Evanger's continues to deflect its responsibility by blaming others for its recalls.

127. On April 25, 2017, Evanger's filed a lawsuit seeking multi-millions in damages against Bailey Farms, LLC ("Bailey"), its hand-selected, meat supplier for **over 40 years**, located at 549 Karem Drive, Marshall, Wisconsin, in the Circuit Court of Cook County, Illinois (Case No. 2017-L-004153).  Evanger's alleges that Bailey sold it meat that tested positive for pentobarbital including the shipments that were used in cans of the Pet Foods that Plaintiffs purchased on December 31, 2016 that poisoned Plaintiffs' dogs, including Talula, who died as a result.[57]

---

[57] The lawsuit is referred to herein as the "Bailey Lawsuit" and the paragraphs in the complaint are cited to herein as "Compl. ¶."

128. In the lawsuit, Evanger's admits that on June 2, 2016, it received 42,340 pounds of "Inedible Hand Deboned Beef" "For Pet Food Use Only. Not Fit for Human Consumption" from Bailey for an invoice price of $15,789.30. Evanger's used this meat that was not certified or inspected for human food by the USDA to make 50,000 cans of Hunk of Beef, including lot #1816EO6HB13 from which Plaintiffs purchased three cans that were fed to their dogs and caused the dogs' illnesses. Exhibit E, Bailey's Bill of Lading and Invoice to Evanger's for meat used in Hunk of Beef (Compl. ¶¶ 7-12 submitted as Exhibits 1 and 2).

129. Evanger's included in its complaint against Bailey the FDA testing results for Hunk of Beef cans from lot #1816EO6HB13, showing that the products tested positive for pentobarbital and phenytoin, an anti-seizure medication. Exhibit F, FDA testing results Hunk of Beef (Compl. ¶ 15, submitted as Exhibit 3).

130. Evanger's also admits in the lawsuit that on November 16, 2015, it received 43,120 pounds of "Inedible Hand Deboned Beef" "For Pet Food Use Only. Not Fit for Human Consumption" from Bailey for an invoice price of $15,653.20. Evanger's used this meat, that was not certified or inspected for human food by the USDA, to produce cans of Against the Grain Hand Pulled Beef, including lot #2415E01ATB12 from which Plaintiffs purchased three cans. Exhibit G, Bailey's Bill of Lading and Invoice to Evanger's for meat used in Pulled Beef (Compl. ¶¶ 43-45, submitted as Exhibit 5 and 6).

131. Evanger's also included in its complaint the FDA testing results for Pulled Beef cans from lot #2415E01ATB12, showing that these products also tested positive for pentobarbital and phenytoin. Exhibit H, FDA testing results Pulled Beef (Compl. ¶ 45, submitted as Exhibit 7).

132. Evanger's further states in its complaint that "it would be highly unlikely that pentobarbital would be administered to a cow; cows are not generally euthanized." Evanger's also alleges that its own testing found that Hunk of Beef

from lot #1816EO6HB13, which it labels "100% beef," was not entirely beef, and instead also found the presence of **horse** DNA. Exhibit I, DNA testing of Hunk of Beef (Compl. ¶ 17, submitted as Exhibit 4).

133. In its claims of fraud relating to Bailey's APHIS certification, Evanger's alleges that each bill of lading, invoice and pallet of beef that Bailey shipped to Evanger's contained a tag with Bailey's "APHIS certificate number 'WI-BLO-0004'" that had been expired for years. Evanger's stated that it relied upon these representations when Evanger's stated to customers that its products came from USDA inspected facilities, even though Evanger's **continues to make these statements on its website now**. Compl. ¶ 58-62, 66-68.

134. As the FDA confirmed and stated in its press releases, however, none of Evanger's suppliers were inspected by USDA-**FSIS**, which is the only entity that regulates the slaughter of animals for human consumption and speciation.  Only meat from a USDA-FSIS facility would be appropriate for Evanger's to represent as "human grade, USDA inspected" meats, and Evanger's products were never certified as such.  Further, APHIS only provides a certifications for exporting.[58]

135. In addition to Bailey's pet food company that provides both commercial and retail pet food,[59] Bailey also operates, at the same location, a stock removal company that "picks up **fresh, down and dead cows, horses and calves**" for use in pet food:

---

[58] FDA, Q&A, (last visited May 2, 2017).

[59] Bailey Farms, LLC, http://www.baileyfarmspets.com/index.php (last visited May 2, 2017).

1

2

3

4

5

6

7

8

9

10

11

12

13



14 Bailey Farms Stock Removal, http://baileyfarmsstockremoval.com/ (last visited

15 May 2, 2017).

16      136. Evanger's misrepresents to customers that its Pet Foods are "premium,"

17 "100% beef" from "USDA-inspected, human grade facilities," when in fact they are

18 not. Evanger's even uses terminology reserved for top human cuisine, like "foodie's

19 choice," to describe its Pet Foods and convince customers that their products are top

20 human grade. Customers, including Plaintiffs, relied on these false representations

21 that the Pet Foods were healthy, high quality and safe, when they purchased

22 Evanger's products and paid a price significantly higher than competing products.

23 In reality, Evanger's Pet Foods were not fit for sale and put consumers' pets at risk

24 of being poisoned. The Pet Foods are misbranded and adulterated, in violation of

25 state and federal law, because they are not from USDA-inspected, human-grade

26 facilities; are made up of animals – cows, horses and pigs – that died by means other

27

28

than slaughter; contain poisonous pentobarbital; and were made at Defendants'
unsanitary facility that further contaminated them.

137. Evanger's Pet Foods labeled as "USDA-Organic" and "Oregon Tilth
certified" mislead customers by indicating that the products are made of high quality,
USDA-inspected, human grade ingredients and are made in clean and sanitary
facilities. However, the FDA's inspections confirmed that Defendants' facilities are
unsanitary exposing its Pet Foods to contamination and health risks, and that the Pet
Foods are not sourced from USDA-inspected suppliers and are not human grade.
Evanger's meat supplier uses animals that have died by means other than slaughter,
rendering those products unsafe, unhealthy, adulterated and misbranded in violation
of state and federal law and not compliant with organic or Oregon Tilth standards.

138. Evanger's Pet Foods that are labeled as kosher similarly mislead
customers into purchasing these products because customers reasonably believe that
the products do not contain certain ingredients, including non-kosher pork, and are
otherwise not adulterated. Contrary to the representation of being kosher, the FDA
found that Evanger's Pet Foods are made in unsanitary facilities that cause
contamination, are not USDA-inspected nor human grade, and are adulterated with
pentobarbital and made of animals that did not die by slaughter. The USDA-FSIS's
speciation testing also found trace amounts of non-kosher pork and equine, as well
as beef, in its Pet Foods.

139. Evanger's has carried out a consistent and widespread campaign of
deceptively promoting its Pet Foods as "100% beef," "human grade," "USDA
inspected," "safe," "premium, high quality" and even consisting of organic and
kosher meat ingredients. Evanger's core marketing statements indicate that its Pet
Foods contain 100% beef, contain quality ingredients, are human grade and USDA
inspected, despite recalls and FDA inspections and public statements that prove

otherwise.  Because the Pet Foods are illegally misbranded and adulterated, they were unfit and unsafe for sale.

140. Defendants' misrepresentations have occurred in at least three forms, all of which constitute "advertising."  These include: (i) product packaging, (ii) materials provided to stores that carry Evanger's Pet Foods, and (iii) Evanger's social media and website, through which it directly sells its Pet Foods to the public.

141. Defendants' pervasive advertising message misrepresents the quality of its Pet Foods and the health risks associated with their consumption. FDA testing confirms that the Pet Foods were not human quality, USDA inspected meats, or even beef. Instead, the Pet Foods were manufactured from meat provided by a non-USDA meat supplier that hauls dead cows, horses and calves that did not die by slaughter; contained poisonous pentobarbital from euthanized animals; and were produced at Defendants' unsanitary facilities that contaminated the Pet Foods, making them adulterated under the law, unfit for sale and unsafe for pets to eat and people to handle.

142. Defendants' pattern of deceptive marketing continues today, including false, misleading and deceptive statements relating to "human grade" ingredients from "USDA inspected facilities." Defendants' current advertising conveys the impression that the products are of high quality and safe for companion animals to consume when they are not.

## CLASS ACTION ALLEGATIONS

143.   Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis.  Plaintiffs bring this action on behalf of themselves and all members of the following class comprised of:

All persons, exclusive of Defendants and its employees, who purchased

in the United States, one or more of Defendants' Pet Foods from June

16, 2013 to the present (the "Nationwide Class").

144. Plaintiffs bring this action on behalf of themselves and all members of the following subclasses comprised of:

All persons, exclusive of Defendants and its employees, who purchased

in the State of Washington one or more of Defendants' Pet Foods from

June 16, 2013 to the present (the "Washington Subclass").

145. The Nationwide Class and the Washington Subclass are collectively referred to herein as the "Classes."

146. Plaintiffs reserve the right to modify or amend the definitions of the Classes after they have had an opportunity to conduct discovery.

147. Claims I, VIII-XII are brought by Plaintiffs on behalf of themselves and the Nationwide Class. Claims II-VII are brought by Plaintiffs on behalf of themselves and the Washington Subclass.

148. **Numerosity. Rule 23(a)(1).** The members of the Classes are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe that the proposed Classes contain at least thousands of purchasers of Defendants's Pet Foods who have been damaged by Defendants's conduct as alleged herein. The number of Class members is unknown to Plaintiffs but could be discerned from the records maintained by Defendants.

149. **Existence of Common Questions of Law and Fact. Rule 23(a)(2).** This action involves common questions of law and fact, which include, but are not limited to, the following:

a. Whether the statements made by Defendants as part of its advertising for its Pet Foods discussed herein are true, or are

1   reasonably likely to deceive, given the misrepresentation of

2   material fact described above;

3       b.   Whether Defendants has violated its implied warranties relating

4   to the Pet Foods under the Magnuson-Moss Warranty Act, 15

5   U.S.C. § 2301, *et seq.*;

6       c.   Whether Defendants has breached its express warranties to

7   customers relating to the Pet Foods under Wash. Rev. Code §

8   62A.2-313;

9       d.   Whether Defendants breach its implied warranties of

10  merchantability regarding the Pet Foods to customers under

11  Wash. Rev. Code § 62A.2-314;

12      e.   Whether Defendants' conduct described herein constitutes an

13  unfair and/or deceptive act or practice in violation of the

14  Washington Consumer Protection Act, § 19.86.010, *et seq.*;

15      f.   Whether Defendants was negligent in its actions under Wash.

16  Rev. Code § 7.72.030(1);

17      g.   Whether Defendants is subject to strict products liability under

18  Wash. Rev. Code § 7.727.030(2);

19      h.   Whether Defendants was unjustly enriched under Washington

20  law;

21      i.   Whether Defendants' conduct described herein constitutes a

22  unfair and/or deceptive act or practice in violation of the Illinois

23  Consumer Fraud and Deceptive Business Practices Act, 815 Ill.

24  Comp. Stat. 505/1, *et seq*.

25      j.   Whether Defendants breached its express warranties relating to

26  the Pet Foods to customers under Illinois law;

27      k.   Whether Defendants was negligent under Illinois law;

28

l.     Whether Defendants is liable under Illinois product liability;

m.    Whether Defendants was unjustly enriched under Illinois law;

n.     Whether Plaintiffs and the other members of Classes are entitled to damages; and

o.     Whether Plaintiffs and the Classes are entitled to injunctive relief, restitution or other equitable relief and/or other relief as may be proper.

150.   ***Typicality*.  *Rule 23(a)(3)*.**   All members of the Classes have been subject to and affected by the same conduct and omissions by Defendants.   The claims alleged herein are based on the same violations by Defendants that harmed Plaintiffs and members of the Classes. By purchasing Evanger's Pet Foods during the relevant time period, all members of the Classes were subjected to the same wrongful conduct.   Plaintiffs' claims are typical of the Classes' claims and do not conflict with the interests of any other members of the Classes. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.

151.   ***Adequacy.  Rule 23(a)(4).***   Plaintiffs will fairly and adequately protect the interests of the members of the Classes.   Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.   Plaintiffs have no adverse or antagonistic interests to those of the Classes.

152.   ***Injunctive and Declaratory Relief.   Rule 23(b)(2).***   Defendants' actions regarding the deceptions and misrepresentations regarding Evanger's Pet Foods are uniform as to members of the Classes. Defendants has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief as requested herein is appropriate respecting the Classes as a whole.

153. ***Predominance and Superiority of Class Action. Rule 23(b)(3).*** Questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

    a.    Absent a class action, members of the Classes as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain its ill-gotten gains;

    b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

    c.    When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

    d.    A class action will permit an orderly and expeditious administration of the claims of each member of the Classes and foster economies of time, effort, and expense;

    e.    A class action regarding the issues in this case does not create any problems of manageability; and

    f.    Defendants has acted on grounds generally applicable to the members of the Classes, making class-wide monetary relief appropriate.

154. Plaintiffs do not contemplate class notice if the Classes are certified under Rule 23(b)(2), which does not require notice, and notice to the putative Classes may be accomplished through publication, signs or placards at the point-of-sale, or other forms of distribution, if necessary; if the Classes are certified under Rule 23(b)(3); or if the Court otherwise determines class notice is required. Plaintiffs

will, if notice is so required, confer with Defendants and seek to present the Court with a stipulation and proposed order on the details of a class notice program.

## COUNT I
### Violation of the Magnuson-Moss Warranty Act,
### 15 U.S.C. § 2301, *et seq.*
### (on behalf of Plaintiffs and the Nationwide Class)

155.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

156.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

157.   At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (the "MMWA").

158.   Evanger's Pet Foods are consumer products as defined in 15 U.S.C. § 2301(1).

159.   Evanger's is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) and (5).

160.   Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3).  They are consumers because they are persons who bought the Pet Foods and are entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

161.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs and the members of the Nationwide Class are entitled to bring this class action and are not required to give Evanger's notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.  However, Plaintiffs already gave the required notice on behalf of themselves and the Classes by email dated January 3, 2017.

162.   In connection with its sale of the Pet Foods, Evanger's gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, Evanger's warranted that the Pet Foods: (a) were fit for its ordinary purpose as safe dog food, (b) would pass without objection in the trade under its contract description as dog food, (c) were adequately contained, packaged and labeled as the agreements required, and (d) conformed to the promises and affirmations of fact set forth on its container and label.  Wash. Rev. Code § 62A.2–314.

163.   Evanger's is liable to Plaintiffs and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

164.   Evanger's initially breached the implied warranty of merchantability as to Plaintiffs and the members of the Nationwide Class because the Pet Foods were not fit for the ordinary purposes for which they are used—a safe, healthy, kosher dog food specifically represented as containing USDA inspected, human grade and kosher ingredients. Specifically, Evanger's Pet Foods contained non-USDA inspected and non-human grade ingredients, were adulterated and not 100% beef as labeled, which made them unfit for their ordinary purpose of providing safe, healthy dog food. In fact, Evanger's has caused injury and death to animals, who have consumed the Pet Foods.

165.   Evanger's further breached its implied warranty of merchantability to Plaintiffs and members of the Nationwide Class because the Pet Foods were adulterated in violation of federal and state law, because they contained poisonous pentobarbital, were made in unsanitary conditions that contaminated them, and contained animals that did not die by slaughter.

166.   Evanger's further breached its implied warranty of merchantability to Plaintiffs and members of the Nationwide Class because the Pet Foods were misbranded in violations of federal and state law, because instead of containing

100% kosher beef and USDA inspected, human grade meat, they contained meat from horses and pigs that were not USDA inspected, human grade nor kosher.

167.   Evanger's further breached its implied warranty of merchantability to Plaintiffs and members of the Nationwide Class because the Pet Foods were not adequately contained, packaged, and labeled. The directions and labeling that accompanied the Pet Foods did not warn Plaintiffs and the Nationwide Class of the dangers of feeding the Pet Foods to their pets, and that the Pet Foods were not comprised and produced as described.

168.   Evanger's finally breached its implied warranty of merchantability to Plaintiffs and members of the Nationwide Class because the Pet Foods did not conform to the promises and affirmations of fact set forth on its container and label, as described above.  Specifically, the Pet Foods did not constitute safe, healthy food with 100% beef and USDA inspected, human grade ingredients.

169.   Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and members of the Nationwide Class are entitled to recover the following damages proximately caused to them by Evanger's breach of the implied warranty of merchantability: (1) the difference in value between the Pet Foods as warranted (the full purchase price) and the Pet Foods as actually delivered ($0.00) because the Pet Food should not have been sold since they were adulterated and misbranded, and consumers would not have purchased them; (2) the veterinarian bills caused by consumption of the Pet Foods; (3) for those whose pets died from eating the Pet Foods, the market value of the animals; and (4) for those whose pets died from eating the Pet Foods, the cost of disposing of the remains.

170.   In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and members of the Nationwide Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiffs and the

members of the Nationwide Class in connection with the commencement and prosecution of this action.

### COUNT II
### Breach of Express Warranty
### Wash. Rev. Code § 62A.2–313
### (on behalf of Plaintiffs and the Washington Subclass)

171.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

172.   Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

173.   Evanger's constitutes both a "merchant" and a "seller," as those terms are defined in Wash. Rev. Code §§ 62A.2-104 and 62A.2-103, in connection with sale of its Pet Foods to Plaintiffs and the Washington Subclass.

174.   Plaintiffs and the members of the Washington Subclass constitute "buyers," as that term is defined in Wash. Rev. Code § 62A.2-103.

175.   The Pet Foods, themselves, constitute "goods," as that term is defined in Wash. Rev. Code § 62A.2-105.

176.   The statements on Evanger's advertising of its Pet Foods created express warranties, including that Evanger's was 100% kosher beef, USDA inspected, human grade ingredients, and was healthy and safe for consumption by pets, under both common law and Wash. Rev. Code § 62A.2–313.  Said statements include, but are not limited to, Pet Foods being "100% beef" "gourmet" labeling; advertising it as "USDA Inspected" and "human grade" meat.

177.   The statements regarding Evanger's described in detail above constituted descriptions, affirmations of fact and promises relating to the Pet Foods that became part of the basis for the bargain between customers and Evanger's for the purchase of the Pet Foods. They created an express warranties that the Pet Foods would conform to Evanger's descriptions, affirmations of fact and promises.

178.   The Pet Foods were not 100% beef, USDA inspected nor human grade and were not safe for pets to consume and caused pets to become ill and/or die.  The unsafe nature of the Pet Foods constituted a breach of these express warranties. Defendants knew that its Pet Foods were not fit for human consumption, not USDA-FSIS inspected, and were made in an unsanitary facility that contaminated them.

179.   Plaintiffs and members of the Washington Subclass were injured as a proximate result of Evanger's aforementioned breaches as follows: (a) in the amount of the difference in value between the value of the Pet Food as warranted (its full purchase prices) and the Pet Food as actually delivered ($0) since the Pet Foods should not have been sold because they were adulterated and misbranded and customers would not have paid anything for them had they known); (b) the veterinarian bills incurred as a result of their pets consuming the Pet Foods; (c) for those whose pets died from consuming the Pet Foods, the market value of those animals; and (d) for those whose animals died from consuming the Pet Foods, the cost of disposing of their remains.

180.   Within a reasonable time after their discovery of Evanger's breaches, Plaintiffs gave notice of the breaches of the express warranties on behalf of themselves and the Classes. Alternatively, this pleading constitutes a sufficient notice of Evanger's breaches of the express warranties. Alternatively, it was not necessary for Plaintiffs and the Classes' members to give Defendants notice of its breaches of the express warranties as to them because it already had actual notice of those breaches.

**COUNT III**
**Breach of the Implied Warranty of Merchantability**
**Wash. Rev. Code § 62A.2–314,**
**(on behalf of Plaintiffs and the Washington Subclass)**

181.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

182.   Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

183.   Evanger's is a "seller" and "merchant" as to the Pet Foods within the meaning of Wash. Rev. Code §§ 62A.2-103 and 62A.2-104.

184.   Evanger's designed, manufactured and sold the Pet Foods, which constitute "goods" within the meaning of Wash. Rev. Code § 62A.2-105.

185.   Plaintiffs and members of the Washington Subclass constitute "buyers" within the meaning of Wash. Rev. Code § 62A.2-103.

186.   Under Wash. Rev. Code § 62A.2–314, Evanger's impliedly warranted that the Pet Foods were merchantable, including that they: (a) were fit for their ordinary purposes as "100% kosher beef," "USDA inspected, human grade" meat, safe and healthy dog food, (b) could pass without objection in the trade under its contract description as pet food, (c) were adequately contained, packaged, and labeled as the agreements required, and (d) conformed to the descriptions, promises and affirmations of fact set forth on its advertising, container and labels.

187.   The Pet Foods were sold in sealed packaging, and the identified issues existed when they left Evanger's control, including Evanger's knowledge that the Pet Foods were not fit for human consumption, were not USDA-FSIS inspected and were made in an unsanitary facility that contaminated them.

188.   When Evanger's designed, manufactured, distributed and sold the Pet Foods, it knew the purpose for which they were intended; i.e., that they would be consumed by pets.

189.   Evanger's initially breached the implied warranty of merchantability as to Plaintiffs and members of the Washington Subclass because the Pet Foods were not fit for the ordinary purposes for which they were used—a safe, healthy pet food. Specifically, Evanger's Pet Foods were adulterated because they contained poisonous pentobarbital, were made in an unsanitary facility that contaminated them,

and were made up of animals that did not die by slaughter, all of which are not approved for use in food and made them unfit for their ordinary purpose of providing safe, healthy pet food. The Pet Foods were also misbranded, which is prohibited under the law because instead of being made with 100% kosher beef that is USDA inspected and human grade as Evanger's advertised, they were made up of non-USDA, non-human grade, non-kosher meat that was not 100% beef. The Pet Foods have caused injury and death to animals, who have consumed the Pet Foods.

190.   Evanger's further breached its implied warranty of merchantability to Plaintiffs and members of the Washington Subclass because the Pet Foods would not pass without objection in the trade under its contract description as pet food because they were adulterated and misbranded, which is prohibited under state and federal law.

191.   Evanger's further breached its implied warranty of merchantability to Plaintiffs and members of the Washington Subclass because the Pet Foods were not adequately contained, packaged, and labeled. The directions and labeling that accompanied the Pet Foods did not warn or disclose to Plaintiffs and members of the Washington Subclass of the dangers of feeding Pet Foods to their pets, and that the Pet Foods were not as described.

192.   Evanger's finally breached its implied warranty of merchantability to Plaintiffs and members of the Washington Subclass because the Pet Foods did not conform to the descriptions, promises and affirmations of fact set forth on their container and label, as described above.  Specifically, they did not constitute "100% kosher beef," "USDA-inspected, human grade" ingredients, healthy and safe food for pets.

193.   Plaintiffs and members of the Washington Subclass were injured as a proximate result of Evanger's aforementioned breaches as follows: (a) in the amount of the difference in value between the value of the Pet Foods as warranted (its full

purchase prices) and the Pet Foods as actually delivered ($0) since they should not have been sold because of their adulteration and misbranding, and consumers would not have paid anything for them had they known; (b) the veterinarian bills incurred as a result of their pets consuming the Pet Foods; (c) for those whose pets died from consuming the Pet Foods, the market value of those animals; (d) for those whose animals died from consuming the Pet Foods, the cost of disposing of their remains; and (e) other economic losses, including the increased risk of health problems in their pets.

194.   Within a reasonable time after their discovery of Evanger's breaches, Plaintiffs gave notice of the breaches of the implied warranty of merchantability on behalf of themselves and the Washington Subclass. Alternatively, this pleading constitutes a sufficient notice of Evanger's breaches of the implied warranty of merchantability. Alternatively, it was not necessary for Plaintiffs to give Evanger's notice of its breaches of the implied warranty of merchantability as to them and the Washington Subclass because Evanger's had actual notice of such breaches.

**COUNT IV**
**Violation of the Washington Consumer Protection Act**
**Wash. Rev. Code § 19.86.010, *et seq*.**
**Non-Per Se Unfair Business Practices**
**(on behalf of Plaintiffs and the Washington Subclass)**

195.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

196.   Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

197.   The Washington Consumer Protection Act ("WCPA") declares unlawful (i) an unfair or deceptive act or practice, (ii) occurring in trade or

commerce, (iii) with a public interest impact, and (iv) which causes injury to Plaintiffs.

198.   Evanger's is a "person" within the meaning of the WCPA, Wash. Rev. Code § 19.86010(1), and conducts "trade" and "commerce" within the meaning of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010(2).

199.   Plaintiffs and the Washington Subclass members are "persons" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(1).

200.   As the purpose of the WCPA is "to protect the public and foster fair and honest competition," the act should be "liberally construed" to serve its beneficial purposes. Wash. Rev. Code § 19.86.920.

201.   In the context of the WCPA, pleading and proof of an unfair act or practice under Wash. Rev. Code § 19.86.020 bears little resemblance to pleading and proof of common law fraud. It can be predicated on an act or practice so designated by statute; an act or practice that has the capacity to deceive substantial portions of the public; or an unfair act or practice not regulated by statute but in violation of the public interest. An act or practice can be unfair without being deceptive and still violate the WCPA.

202.   At all relevant times, Evanger's engaged in unfair acts or practices in the conduct of its business by describing, promising and affirming on its container and label that its Pet Foods are "100% kosher beef," "USDA inspected, human grade," healthy and safe when they were not as found and publicly denounced by the FDA. In fact, they were adulterated and misbranded as prohibited under the law, and were unsafe for animals to eat because they contained poisonous pentobarbital, were contaminated by unsanitary facilities and were made up of animals that did not die from slaughter. Evanger's further engaged in unfair acts or practices in the conduct of its business when it did not provide a refund to customers, who purchased the Pet Foods based on Evanger's false representations and did not return them.

203.   At all relevant times, Evanger's further engaged in unfair acts and practices when it failed to disclose material information about the Pet Foods including their quality, related health risks, adulteration and misbranding.  Evanger's has failed to provide adequate warnings or notices of health risks from the Pet Food and does not disclose that they are unfit to be sold and to be consumed by animals.

204.   Evanger's admitted in its own lawsuit against its supplier that the bill of lading on the meat it purchased and received, and used in its Pet Food, stated that the meat was "inedible" and "not fit for human consumption," and was not USDA-FSIS inspected. Instead, the Pet Foods were adulterated and misbranded, should have not been sold, and were unsafe for animals to consume.

205.   Evanger's stated in its recall in February and March 2017 that no other pet foods were impacted, however, a month later, another pet food that it manufacturers for Party Animal also tested positive for pentobarbital and sickened another animal leading to another recall. Evanger's was also aware that its facilities were unsanitary and could contaminate its Pet Foods as the FDA found.

206.   Evanger's concealed and misrepresented this information about its Pet Foods to Plaintiffs and the Washington Subclass members, which is material in that a reasonable consumer would not have purchased the Pet Foods and subjected himself, herself or their pets to injury had he or she known these facts.

207.   Evanger's conducted its acts and practices described herein in the course of trade or commerce.

208.   Defendants' unfair acts and practices impact the public interest. Defendants committed the acts and practices in the course of its everyday business; the acts and practices are part of a pattern or generalized course of business; Defendants committed the acts and practices repeatedly and continually both before and after Plaintiffs' purchase of the Pet Foods; there is a real and substantial potential

1  for repetition of Defendants' conduct; and many customers are affected or likely to

2  be affected.

3      209.   The acts and practices described above are unfair because these acts or

4  practices (1) have caused substantial financial injury to Plaintiffs and the

5  Washington Subclass members; (2) are not outweighed by any countervailing

6  benefits to consumers or competitors; and (3) are not reasonably avoidable by

7  consumers.

8      210.   Evanger's unfair practices have occurred in its trade or business and

9  were and are capable of injuring a substantial portion of the public. As such,

10  Evanger's general course of conduct as alleged herein is injurious to the public

11  interest, and the acts complained of herein are ongoing and/or have a substantial

12  likelihood of being repeated.

13      211.   As a direct and proximate result of Evanger's unfair acts or practices,

14  Plaintiffs and the Washington Subclass members suffered injury in fact and lost

15  money.

16      212.   Plaintiffs and the Washington Subclass are therefore entitled to:

17      1) an order enjoining the conduct complained herein;

18      2) actual damages to Plaintiffs and the Washington Subclass equal to: (a) the

19  amount the Plaintiffs and the Washington Subclass paid for the worthless Pet Foods:

20  the difference in value between the value of the Pet Foods as represented (the full

21  purchase prices) and the value of the Pet Foods as actually accepted and delivered

22  ($0) since it should not have been sold because of its adulteration and misbranding,

23  and consumers would not have paid anything for it had they known; (b) their

24  veterinarian bills incurred as a result of their pets consuming the Pet Foods; (c) for

25  those whose pets died from eating the Pet Foods, the market value of their animals;

26  and (d) for those whose animals died from eating the Pet Foods, the cost of disposing

27  of their remains;

28

3) treble damages pursuant to Wash. Rev. Code § 19.86.090;

4) costs of suit, including a reasonable attorney's fee; and

such further relief as the Court may deem proper.

213.   Plaintiffs and the Washington Subclass are also entitled to equitable relief as the Court deems appropriate, including, but not limited to, disgorgement, for the benefit of the Subclass members, or all or part of the ill-gotten profits Evanger's received from the sale of its Pet Food.

**COUNT V**
**Violation of the Washington Consumer Protection Act**
**Wash. Rev. Code § 19.86.010,** *et seq*.
**Non-Per Se Deceptive Business Practices**
**(on behalf of Plaintiffs and the Washington Subclass)**

214.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

215.   Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

216.   The Washington Consumer Protection Act ("WCPA") declares unlawful (i) an unfair or deceptive act or practice, (ii) occurring in trade or commerce, (iii) with a public interest impact, and (iv) which causes injury to Plaintiffs.

217.   Evanger's is a "person" within the meaning of the WCPA, Wash. Rev. Code § 19.86010(1), and conducts "trade" and "commerce" within the meaning of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010(2).

218.   Plaintiffs and the Washington Subclass members are "persons" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(1).

219.   As the purpose of the WCPA is "to protect the public and foster fair and honest competition," the act should be "liberally construed" to serve its beneficial purposes. Wash. Rev. Code § 19.86.920.

220.   At all relevant times, Evanger's engaged in deceptive acts or practices in the conduct of its business by describing, promising and affirming on its container and label that its Pet Foods are "100% kosher beef," "USDA inspected, human grade," healthy and safe when they were not. In fact, they were adulterated and misbranded as prohibited under the law, and were unsafe for animals to eat because they contained poisonous pentobarbital.

221.   At all relevant times, Evanger's engaged in deceptive acts or practices by failing to disclose the quality of its Pet Foods and without providing adequate warning or notice of their related health risks.

222.   Evanger's further engaged in deceptive acts or practices in the conduct of its business when it did not provide a refund to customers, who purchased the Pet Foods and did not return them based on Evanger's omissions and false representations.

223.   Evanger's has also continued to misrepresent that its Pet Foods are from USDA inspected suppliers and human grade when they are not, as determined and publicly stated by the FDA.

224.   At all relevant times, Evanger's engaged in deceptive acts or practices in the conduct of its business by describing, promising and affirming on its container and label that the Pet Foods were "100% kosher beef," "USDA inspected, human grade," healthy and safe for pets to consume, when in fact it knew or had reason to know that they were not. In fact, Evanger's admitted in its own lawsuit against its supplier that the bill of lading on the meat it purchased and received, and which Evanger's used in its Pet Food, stated that the meat was "inedible" and "not fit for human consumption," and was not USDA-FSIS inspected. Instead, the Pet Foods were adulterated and misbranded, should have not been sold, and were unsafe for animals to consume.

225.   Evanger's further engages in deceptive acts or practices in the conduct of its business as it continues to misrepresent that its Pet Foods are "100% kosher beef," "USDA inspected" and "human grade" after the FDA found and publicly stated that none of its suppliers are USDA inspected and are not human grade and its Pet Foods are not 100% beef.

226.   Evanger's stated in its recall in February and March 2017 that no other pet foods were impacted, however, a month later, another pet food that it manufacturers for Party Animal also tested positive for pentobarbital and sickened another animal leading to another recall.

227.   Evanger's was also aware that its facilities were unsanitary and could contaminate its Pet Foods as the FDA found.

228.   Evanger's concealed and misrepresented this information about its Pet Foods to Plaintiffs and the Washington Subclass members, which is material in that a reasonable consumer would not have purchased the Pet Foods and subjected himself or herself to injury had he or she known these facts.

229.   Evanger's conducted its acts and practices described herein in the course of trade or commerce.

230.   Defendants' deceptive acts and practices impact the public interest. Defendants committed the acts and practices in the course of its everyday business; the acts and practices are part of a pattern or generalized course of business; Defendants committed the acts and practices repeatedly and continually both before and after Plaintiffs' purchase of the Pet Foods; there is a real and substantial potential for repetition of Defendants' conduct; and many customers are affected or likely to be affected.

231.   The acts and practices described above are deceptive because these acts or practices (1) have caused substantial financial injury to Plaintiffs and the Washington Subclass members; (2) are not outweighed by any countervailing

benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers.

232.   Evanger's deceptive practices have occurred in its trade or business and were and are capable of injuring a substantial portion of the public.   As such, Evanger's general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

233.   As a direct and proximate result of Evanger's deceptive acts or practices, Plaintiffs and the Washington Subclass members suffered injury in fact and lost money.

234.   Plaintiffs and the Washington Subclass are therefore entitled to:

1) an order enjoining the conduct complained herein;

2) actual damages to Plaintiffs and the Washington Subclass equal to: (a) the amount the Plaintiffs and the Washington Subclass paid for the worthless Pet Foods: the difference in value between the value of the Pet Foods as represented (the full purchase prices) and the value of the Pet Foods as actually accepted and delivered ($0) since it should not have been sold because of its adulteration and misbranding, and consumers would not have paid anything for it had they known; (b) their veterinarian bills incurred as a result of their pets consuming the Pet Foods; (c) for those whose pets died from eating the Pet Foods, the market value of their animals; and (d) for those whose animals died from eating the Pet Foods, the cost of disposing of their remains;

3) treble damages pursuant to Wash. Rev. Code § 19.86.090;

4) costs of suit, including a reasonable attorney's fee; and

such further relief as the Court may deem proper.

235.   Plaintiffs and the Washington Subclass are also entitled to equitable

relief as the Court deems appropriate, including, but not limited to, disgorgement, for the benefit of the Subclass members, or all or part of the ill-gotten profits Evanger's received from the sale of its Pet Food.

**COUNT VI**
**Negligence - Washington Product Liability Act**
**Wash. Rev. Code § 7.72.030(1)**
**(on behalf of Plaintiffs and the Washington Subclass)**

236.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

237.    Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

238.    Evanger's owed a duty of reasonable care to Plaintiffs and the members of the Washington Subclass to provide Pet Foods that were safe for consumption by animals.

239.    Evanger's breached this duty by selling Pet Foods that were adulterated because they contained poisonous pentobarbital; were made in an unsanitary facility that contaminated them; were made up of animals that did not die by slaughter; were misbranded because they did not contain USDA inspected, human grade meat and were not 100% kosher beef; and did not adequately warn Plaintiffs and the members of the Washington Subclass of the Pet Foods' dangers on its packaging.

240.    Such conduct by Evanger's was negligent because it did not reflect the level of care that an ordinarily prudent and reasonable person in Evanger's place would have given under the same or similar circumstances.

241.    Evanger's should have known that the Pet Foods posed a risk of harm to dogs; that purchasers of the Pet Foods, including Plaintiffs and the members of the Washington Subclass, would not recognize the risk and that the risk was misrepresented to them; and that consumption of the Pet Foods by pets would foreseeably result in their injury and death. Such injury and death to the animals

constituted property damage to Plaintiffs and the members of the Washington Subclass beyond, and in addition to, their damage from purchasing the worthless Pet Foods.

242. As a proximate result of Evanger's negligent acts alleged herein, Plaintiffs and the members of the Washington Subclass suffered injury to property, specifically the illness and deaths of their pets, and the expenses incurred therewith.

**COUNT VII**
**Strict Products Liability**
**Wash. Rev. Code § 7.72.030(2)**
**(on behalf of Plaintiffs and the Washington Subclass)**

243. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

244. Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

245. Evanger's designed, manufactured, distributed and sold the Pet Foods, which were adulterated because they contained poisonous pentobarbital, were made in unsanitary facilities that contaminated them, and were made of animals that did not die from slaughter. The Pet Foods were misbranded because they were not made of 100% kosher beef and USDA inspected, human grade meat. The adulterated and misbranded Pet Foods and their potential health risks, at all times material hereto, would not reasonably have been expected by consumers, and constituted an unreasonably dangerous defect and/or condition.

246. The Pet Foods were unreasonably dangerous because of defects in marketing, design and manufacturing, which reasonable consumers would not have expected.

247. There was a defect in the marketing of the Pet Foods, which made the Pet Foods unreasonably dangerous, because Evanger's failed to warn Plaintiffs and

- 70 -

the members of the Washington Subclass, on its advertising, packaging or otherwise, of the potential harm to their pets from consuming the Pet Foods, which warning reasonable consumers would have expected.

248.   The Pet Foods were defectively designed because they were adulterated and misbranded in a manner that made them unsafe. The Pet Foods contained substitute ingredients – ingredients other than those that Evanger's advertised as in its Pet Foods – and failed to include ingredients that could have been used to meet the same needs and not be unsafe or unreasonably expensive. Evanger's had the ability to eliminate the unsafe character of the Pet Foods without seriously impairing their usefulness or significantly increasing their costs. It was not anticipated that purchasers of the Pet Foods would be aware of the dangers inherent in the use of the products, and the expectation of ordinary consumers was that the Pet Foods manufactured by Evanger's would be safe for dogs.

249.   Alternatively, the Pet Foods were defectively manufactured because they were adulterated and misbranded in a manner that caused them to be harmful and deadly to animals, and that deviated in terms of quality from the specifications in a manner that rendered them unreasonably dangerous and not within the expectations of reasonable consumers.

250.   These unreasonably dangerous defects in the marketing, design and manufacture of the Pet Foods existed at the time the Pet Foods left Evanger's control.

251.   The Pet Foods came in sealed packages, and did not change from the time they left Evanger's possession, through the time they arrived in stores to be sold to consumers, and the time when consumers bought and took possession of them.

252.   The unreasonably dangerous defects and/or conditions of the Pet Foods proximately caused injury and death to dogs, and related expenses, constituting property damage to Plaintiffs and the members of the Washington Subclass beyond, and in addition to, their damages from purchasing the harmful Pet Foods.

253.   Accordingly, Evanger's is strictly liable for these damages caused to Plaintiffs and the members of the Washington Subclass by its unreasonably dangerous product.

### COUNT VIII
### Washington Unjust Enrichment
### (on behalf of Plaintiffs and the Washington Subclass)

254.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

255.   Plaintiffs bring this claim on behalf of themselves and the Washington Subclass.

256.   Plaintiffs and the members of the Washington Subclass, at their expense, purchased the Pet Foods, which was defective, not merchantable, and unreasonably dangerous and therefore had no value to them.

257.   Plaintiffs and the members of the Washington Subclass purchased the Pet Foods designed, manufactured and marketed by Evanger's in various retail stores. Evanger's knowingly received and retained a benefit from Plaintiffs and the Washington Subclass members, namely the gross revenues resulting from their purchases.  Evanger's is not justified in retaining these revenues because of the diminished value, inherent defects, adulterated state, misbranded content and general lack of merchantability of the Pet Foods.

258.   Principles of fairness and equity demand that Evanger's disgorge the above-referenced revenues to Plaintiffs and the Washington Subclass members.

**COUNT IX**
**Violation of the Illinois Consumer Fraud and Deceptive Business**
**Practices Act**
**815 Ill. Comp. Stat. 505/1, *et seq*.**
**(on behalf of Plaintiffs and the Nationwide Class)**

259.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

260.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

261.    This cause of action is brought pursuant the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq*. ("ICFA").

262.    The acts and omissions, specifically including Evanger's misrepresentations that the Pet Foods were USDA inspected and of human grade quality including 100% kosher beef, and Evanger's omitting that the Pet Foods were adulterated and misbranded and contained poisonous pentobarbital and failing to provide adequate warning or notice of their health risks, occurred in the conduct of trade or commerce as that term is used therein.

263.    Section 2 of ICFA prohibits unfair or deceptive acts or practices used or employed in the conduct of any trade or commerce, as well as deceptive acts or practices which are committed in the course of trade or commerce and with the intent that others rely upon them. 815 ILCS 505/2.

264.    Section 2 of the ICFA provides, in full:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive

- 73 -

Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section, consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2.

265.   Evanger's acts, misrepresentations and omissions are by their very nature unfair, deceptive and unlawful within the meaning of the ICFA.

266.   Evanger's has disseminated, or caused to be disseminated, advertising, labeling, packaging, marketing, and promotion of the Pet Foods that is deceptive and otherwise violates the ICFA, because at all times material hereto, the advertising, labeling, packaging, marketing and promotion of the Pet Foods included false and/or misleading statements or misrepresentations concerning the quality of the Pet Foods, including that they were USDA inspected and contained human grade ingredients including 100% kosher beef, and/or because Evanger's failed to disclose and/or concealed or omitted material facts, including without limitation, known defects and risks concerning the quality of the Pet Foods and the healthiness of the Pet Foods, including that they were adulterated and misbranded and unsafe for pets to consume.

267.   In making and disseminating the misrepresentations and omissions alleged herein, Evanger's intended to deceive reasonable consumers, including Plaintiffs and the Nationwide Class.

268.   Evanger's made and disseminated the representations and omissions alleged herein in the course of conduct involving trade and commerce.

269.   The utility, if any, of Evanger's practices related to the advertising, labeling, packaging, marketing, promotion and selling of Pet Foods, while making affirmative misrepresentations and without properly disclosing the Pet Foods' true

nature and/or characteristics, is negligible, when weighed against the harm to the general public, Plaintiffs and the Nationwide Class.

270.  The harmful impact upon members of the general public targeted by such practices, including Plaintiffs and the members of the Nationwide Class, who purchased and used the Pet Foods, outweighs any reasons or justifications by Evanger's for the unfair and deceptive business practices Evanger's employed to sell the Pet Foods described herein.

271.  Evanger's had an improper motive (to place profit ahead of accurate marketing) in its practices related to the advertising, labeling, packaging, marketing, promotion and selling of the Pet Foods.

272.  The use of such unfair and deceptive business acts and practices was and is under the sole control of Evanger's, and was deceptively hidden from Plaintiffs and the members of the Nationwide Class, and the general public, in Evanger's advertising, labeling, packaging, marketing, promotion and selling of the Pet Foods in a deceptive effort to put profit over accurate marketing. These deceptive acts and practices had a capacity, tendency, and/or likelihood to deceive or confuse reasonable consumers into believing that the Pet Foods were USDA inspected, human grade, 100% kosher beef, healthy, free of harmful toxic substances, and were otherwise safe.

273.  As a direct and proximate result of Evanger's deceptive and unfair conduct and/or violations of the ICFA, Plaintiffs and the members of the Nationwide Class have suffered and continue to suffer damages, including without limitation the following:

a) The difference in value between the full purchase price of the Pet Foods and the actual value of the Pet Foods (which actual value is $0 because the Pet Foods should not have been sold since they were adulterated and misbranded, and consumers would not have paid anything for them had they

known) - *i.e.*, the full purchase prices of the Pet Foods;

b) All veterinary bills incurred as a result of illness, injury or death caused by consuming the Pet Foods;

c) All bills incurred for the disposition of the remains of dogs killed by the Pet Foods; and

d) The market value of the dogs killed as a result of ingesting the Pet Foods.

274.   Illinois also provides protection to purchasers of animal food from unfair and deceptive practices. 505 ILCS 30/7 (Adulteration), 505 ILCS 30/8 (Misbranding), and 505 ILCS 30/11.1 (Prohibited Acts).

275.   A commercial feed is adulterated if it "bears or contains any poisonous or deleterious substance which may render it injurious to health;" 505 ILCS 30/7, and a commercial feed is misbranded if its "labeling is false or misleading in any particular." 505 ILCS 30/8. Illinois law also prohibits the "manufacture or distribution of any commercial feed that is adulterated or misbranded." 505 ILCS 30/11.1.

276.   The Pet Foods are misrepresented to be 100% beef, USDA inspected and human grade meat, which they are not. Instead they contain poisonous pentobarbital, are made in an unsanitary facility that causes contamination, and contain the remains of animals that did not die by slaughter and were not kosher or all beef. Because of this, the Pet Foods injured Plaintiffs' pets and those of the members of Nationwide Class, and the composition or quality of the Pet Foods falls below what is purported or represented by its label.

277.   Plaintiffs and the other members of Nationwide Class further seek to enjoin such unlawful deceptive acts and practices as described above. Each of the Nationwide Class members will be irreparably harmed unless the unlawful actions of Evanger's are enjoined, in that Evanger's will continue to falsely and

Case 3:17-cv-05469-RBL   Document 1   Filed 06/16/17   Page 77 of 86

misleadingly market and advertise and represent on its packaging the healthy nature of the Pet Foods and that they are USDA inspected when they are not.

278.   Towards that end, Plaintiffs and Nationwide Class request an order granting them injunctive relief requiring removal of the unsafe products from retail outlets, prohibiting false statements, requiring corrective disclosures and/or disclaimers on the labeling and advertising of the Pet Foods, and/or the removal of the harmful ingredients.

279.   Absent injunctive relief, Evanger's will continue to manufacture and sell misrepresented, deceptive and unsafe Pet Foods without disclosing to consumers their true quality and risk of harmful effects.

280.   In this regard, Evanger's has violated, and continues to violate, the Illinois Consumer Fraud and Deceptive Business Practices Act, which makes unfair or deceptive acts or practices used or employed in the conduct of any trade or commerce unlawful. As a direct and proximate result of Evanger's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act as described above, Plaintiffs and the members of the Nationwide Class have suffered damages, as set forth above.

281.   Evanger's affirmative misrepresentations, as well as its wrongful warranty practices, were disseminated and directed from its headquarters in Wheeling, Illinois. Evanger's manufactures its Pet Foods at its facilities in Wheeling and Markham, Illinois. Therefore, based upon the choice-of-law rules applied in this District, Plaintiffs preliminarily identify the substantive laws of Illinois as the most likely to apply to Nationwide Class as alleged in this claim.

**COUNT X**
**Breach of Express Warranty**
**(on behalf of Plaintiff and the Nationwide Class)**

282.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

283.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

284.   Evanger's constitutes a "merchant" and a "seller" in connection with its sales of the Pet Foods, as those terms are defined in the Illinois Uniform Commercial Code.

285.   Plaintiffs and the members of the Nationwide Class constitute "buyers" in connection with their purchases of the Pet Food from Evanger's, as that term is defined in the Illinois Uniform Commercial Code.

286.   The Pet Food constitutes "goods," as that term is defined in the Illinois Uniform Commercial Code.

287.   By affirmations of fact, promises and descriptions made on the Pet Foods' packaging, Evanger's provided Plaintiffs and the other members of the Nationwide Class with written express warranties before or at the time of purchase, including the following:

a)  The Pet Foods were made of 100% kosher beef;

b)  The Pet Foods were made of USDA-inspected meats;

c)  The Pet Foods were human grade quality meats;

d)  The Pet Foods were safe and healthy for pets to eat.

288.   These affirmations of facts and promises made by Evanger's to Plaintiffs and the Nationwide Class related to Pet Foods and became part of the bases of the bargains between them and Evanger's, and thereby created express warranties that the Pet Foods would conform to those affirmations and promises. Furthermore,

the aforementioned descriptions of the Pet Foods were part of the bases of the bargains for the purchases of Pet Foods between Evanger's on the one hand and Plaintiffs and other Nationwide Class members on the other. The descriptions created an express warranty that the goods would conform to those descriptions. As previously noted, Evanger's misrepresented the nature of the Pet Foods, since the Pet Foods were not 100% kosher beef and were not USDA-inspected, human quality meats. Instead, the Pet Foods were adulterated because they contained poisonous pentobarbital, were made in an unsanitary facility that contaminated them, were not made from animals that died by slaughter, and were misbranded. The Pet Foods did not conform to the affirmations, promises and descriptions previously mentioned, resulting in breaches of the Pet Foods' express warranties.

289.   The Pet Foods were marketed directly to consumers by Evanger's, came in sealed packages, and did not change from the time they left Evanger's possession until they were purchased by consumers in stores.

290.   Plaintiffs have complied with all conditions precedent to filing this breach of warranty claim, including providing notice of the breach of warranty to Evanger's on behalf of themselves and the Nationwide Class, prior to filing this action.

291.   Alternatively, the filing of this Complaint provides sufficient notice of breach to Evanger's on behalf of Plaintiffs and the Nationwide Class.

292.   Alternatively, notice need not have been given to Evanger's because Evanger's had actual notice of its breaches of warranty as to Plaintiffs and the Nationwide Class.

293.   As a proximate result of Evanger's breach of express warranties, Plaintiffs and the members of the Nationwide  Class have suffered actual damages as follows:

(a) The difference in value between the full purchase price of the Pet Foods and the actual value of the Pet Foods (which actual value is $0 because the Pet Foods should not have been sold since they were adulterated and misbranded, and consumers would not have paid anything for them had they known) - *i.e.*, the full purchase prices of the Pet Foods;

(b) the veterinarian bills incurred as a result of consumption of the Pet Foods;

(c) the market value of the animals killed by consumption of Pet Foods; and

(d) the cost of disposing of the remains of the animals killed by consumption of Pet Foods.

294.   Plaintiffs and members of the Nationwide Class cannot return Pet Foods to Evanger's for repair as the subject defect is irreparable.

295.   Evanger's affirmative misrepresentations, as well as its wrongful warranty practices, were disseminated and directed from its headquarters in Wheeling, Illinois. Evanger's manufactures its Pet Foods at its own facilities in Wheeling and Markham, Illinois. Therefore, based upon the choice-of-law rules applied in this District, Plaintiffs preliminarily identify the substantive laws of Illinois as the most likely to apply to Nationwide Class as alleged in this claim.

**COUNT XI**
**Illinois Negligence**
**(on Behalf of Plaintiffs and the Nationwide Class)**

296.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

297.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

298.   Evanger's owed a duty of care to Plaintiffs and the Nationwide Class to provide pet food that was unadulterated, not misbranded, safe for consumption by dogs, and free from toxins with harmful effects.

299. Evanger's breached this duty by selling Pet Foods, which were misbranded, adulterated, and not safe, because they contained pentobarbital, were made in an unsanitary facility that contaminated them, and were composed of animals that did not die from slaughter.

300. The Pet Foods were sold without adequate quality control and testing; without using proper manufacturing and production practices; without properly investigating reports of pet deaths and illnesses following consumption of the Pet Foods; and without adequately warning Plaintiffs and the Nationwide Class of the dangers as part of the Pet Foods's packaging or disclosing that the Pet foods were not USDA-inspected, were composed of animals that did not die from slaughter, and were not human quality.

301. Such conduct by Evanger's was negligent in that Evanger's failed to act as an ordinarily prudent and reasonable person would have acted under the same or similar circumstances.

302. Evanger's should have known that Pet Foods posed a risk of harm to animals; that purchasers of Pet Foods, including Plaintiffs and the Nationwide Class, would not recognize the risk and were instead purchasing this product based on Defendants's misrepresentations that the Pet Foods were of a certain quality and would not carry these risks; and that consumption of Pet Foods by animals would foreseeably result in injury and death to those dogs, constituting property damage to Plaintiffs and the Nationwide Class beyond and in addition to the damages from purchasing the harmful Pet Foods.

303. As a proximate result of Evanger's negligent acts alleged herein, Plaintiffs and the Nationwide Class suffered injury to property, specifically in the illness and deaths of their animals and the expenses incurred therewith.

304. Evanger's affirmative misrepresentations, as well as its wrongful warranty practices, were disseminated and directed from its headquarters in

Wheeling, Illinois. Evanger's manufactures its Pet Foods at its facilities in Wheeling and Markham, Illinois. Therefore, based upon the choice-of-law rules applied in this District, Plaintiffs preliminarily identify the substantive laws of Illinois as the most likely to apply to Nationwide Class as alleged in this claim.

## COUNT XII
## Illinois Products Liability
## (on Behalf of Plaintiffs and the Nationwide Class)

305.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

306.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

307.   Evanger's designed, manufactured and sold Pet Foods, which were unsafe because they were misbranded and adulterated, and this misbranding and adulteration caused the Pet Foods to contain poisonous pentobarbital, to be contaminated by the unsanitary facility where they were made, and to be manufactured from animals that did not die from slaughter.

308.   The adulteration and misbranding that made the consumption of the Pet Foods risky to the health of animals was, at all times material hereto, an unreasonably dangerous defect and/or condition. The failure of Evanger's to warn on its package of the dangerousness of the Pet Foods also constituted an unreasonably dangerous defect and/or condition.

309.   These unreasonably dangerous defects and/or conditions existed at the time the Pet Foods left Evanger's control.

310.   The Pet Foods came in sealed packages, and they and their packaging did not change from the time they left Evanger's possession through the time they arrived in stores to be sold to consumers and consumers purchased and took possession of them.

311.   The unreasonably dangerous defects and/or conditions of the Pet Foods proximately caused injury and death to animals, constituting property damage to Plaintiffs and the Nationwide Class beyond and in addition to the damages from purchasing the harmful Pet Foods.

312.   Accordingly, Evanger's is strictly liable for the damages caused to Plaintiffs and the Nationwide Class, by the unreasonably dangerous Pet Foods, specifically the illness and deaths of their animals and the expenses incurred therewith.

313.   Evanger's affirmative misrepresentations, as well as its wrongful warranty practices, were disseminated and directed from its headquarters in Wheeling, Illinois. Evanger's manufactures its Pet Foods at its facilities in Wheeling and Markham, Illinois. Therefore, based upon the choice-of-law rules applied in this District, Plaintiffs preliminarily identify the substantive laws of Illinois as the most likely to apply to Nationwide Class as alleged in this claim.

**COUNT XIII**
**Illinois Unjust Enrichment**
**(on Behalf of Plaintiffs and the Nationwide Class)**

314.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

315.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

316.   Plaintiffs and the Nationwide Class members conferred a benefit on Evanger's by purchasing Pet Foods—namely the gross revenues Evanger's derived from such sales.

317.   Evanger's accepted and retained the benefit in the amount of the gross revenues it received from sales of Pet Foods to Plaintiffs and the Nationwide Class members.

318.   Evanger's has thereby profited under circumstances which would make it unjust for it to be permitted to retain the benefit.

319.   Plaintiffs and the Nationwide Class members are entitled to restitution of the entire amount Evanger's received from its sales of the Pet Foods to them.

320. Evanger's affirmative misrepresentations, as well as its wrongful warranty practices, were disseminated and directed from its headquarters in Wheeling, Illinois. Evanger's manufactures the Pet Foods at its facilities in Wheeling and Markham, Illinois. Therefore, based upon the choice-of-law rules applied in this District, Plaintiffs preliminarily identify the substantive laws of Illinois as the most likely to apply to Nationwide Class as alleged in this claim.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for a judgment:

a.   Certifying each of the Classes as requested herein, appointing Plaintiffs as class representatives for the Class and respective Subclass;

b.   Providing restitution to Plaintiffs and the Class for any wrongful act or practice under each cause of action where such relief is permitted;

c.   Enjoining Defendants from continuing the unlawful practices as set forth herein, including marketing or selling its products that may be misrepresented, adulterated and misbranded, and specifically falsely stating that they are USDA-inspected, human-grade quality, 100% kosher beef and directing Defendants to engage in corrective action, or providing other injunctive or equitable relief;

d.   Paying veterinary costs and costs for pet care caused by an animal's consumption of the Pet Foods, including medical monitoring;

e.   For pets that died as a result of eating the Pet Foods, payment of the value of the animal and any costs associated with their deaths;

f.   Awarding damages for the value of the Pet Foods based on what was paid versus what they are worth, including treble and punitive damages, to prevent and deter Defendants from future unlawful conduct;

g.   Awarding all equitable remedies available and other applicable law;

h.   Awarding attorneys' fees and costs;

i.   Awarding pre-judgment and post-judgment interest at the legal rate; and

j.   Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 16th day of June, 2017.

TERRELL MARSHALL LAW GROUP PLLC

By:   /s/ Beth E. Terrell, WSBA #26759
Beth E. Terrell, WSBA #26759
Email:  bterrell@terrellmarshall.com

By:  /s/ Jennifer Rust Murray, WSBA #36983
Jennifer Rust Murray, WSBA #36983
Email:  bterrell@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
Telephone:  (206) 816-6603
Facsimile:  (206) 319-5450

1

2

3

4

Jessica J. Sleater
Email:  jessica@andersensleater.com
ANDERSEN SLEATER SIANNI LLC
1250 Broadway. 27th Floor
New York, New York 10001
Telephone: (646) 599-9848

*Counsel for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28